NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

17-P-1109                                       Appeals Court

A.S.R.  vs.  A.K.A.

No. 17-P-1109.

Middlesex.     November 15, 2016. - September 22 , 2017.

Present:  Trainor, Meade, & Hanlon, JJ.

Civil Harassment.  Harassment Prevention.  Intent.  Evidence, Intent.  Criminal Harassment.

Complaint for protection from harassment filed in the Cambridge Division of the District Court Department on May 27, 2015.

A hearing to extend the harassment prevention order was had before James H. Wexler, J.

Ruth O'Meara-Costello for the defendant.
Martin F. Kane, II, & Joan E. Kolligian, for the plaintiff, submitted a brief.

HANLON, J.  After a hearing, a judge of the District Court extended a harassment prevention order, pursuant to G. L.

c. 258E, against the defendant, A.K.A.[1]  She appeals, arguing, among other things, that the judge failed to identify three acts as the basis for the order, failed to make findings supporting A.K.A.'s intent in contacting the plaintiff, A.S.R., and, based on A.S.R.'s testimony that he was not placed in fear of physical harm or property damage as a result of the contact, there was insufficient evidence to extend the order.  Finally, she argues that, even if issuing the order was warranted under the statute, the order was unconstitutional because it penalized constitutionally protected speech.  We affirm.

Background.  At the beginning of the extension hearing, the judge carefully reviewed A.S.R.'s initial affidavit and copies of various voice mail, text, and electronic mail (e-mail) messages admitted as an exhibit packet by agreement of the parties.[2]  He then heard testimony from A.S.R. and A.K.A.; both were represented by counsel.

The parties were in a dating relationship for a little more than one year until September, 2013.  They continued to have

---

[1] Although the order at issue has now expired, the issue is not moot and is properly before us.  See Seney v. Morhy, 467 Mass. 58, 62 (2014).

[2] The exhibit packet consists of a transcript of a message left by A.K.A. on A.S.R.'s voice mail, and copies of text and e-mail messages, some including photographic images, sent by A.K.A. to A.S.R.; all are included in the record appendix. A.K.A. admitted during cross-examination that she authored all of the e-mails contained in the exhibit packet.

contact until January, 2014, because A.S.R. "tried to help [A.K.A.] for a while," but then A.S.R. cut off contact and "made it very clear that [he] didn't want any contact from her." Afterwards, A.K.A. began sending A.S.R. "lots of e-mails, phone calls, [and] appearing in person in an attempt to get [him] to resume contact in a way that made [him] feel very afraid and hurt and abused." Although in March, 2014, A.S.R. threatened to obtain a restraining order, he resumed contact with A.K.A. for a short time in June, 2014, "in an attempt to make things right," because she had sent him images of her having cut herself "and a lot of desperate pleas."[3] Eventually, however, A.S.R. cut off communications again. At the time of the hearing, on June 5, 2015, A.S.R. had not responded to any of A.K.A.'s written communications since June, 2014.

A.S.R. was aware that in July, 2014, A.K.A. had left the country; he learned that she was back in Boston in January, 2015, when she attended a programming event where he was working. However, even while A.K.A. was living out of the country, A.S.R. was receiving "a pretty steady stream" of e-mails from her, despite the fact that he had blocked her e-mail accounts and telephone numbers. He testified that "she would

---

[3] The images contained in A.K.A.'s e-mails showed scars on her arms, neck, and chest area.

find ways around it."[4]  A.K.A. was able to skirt A.S.R.'s e-mail filters by sending messages from new e-mail addresses, and she would also call from unlisted telephone numbers so that her calls would not be blocked.  A.S.R. testified that, after he broke off contact with A.K.A., he received "hundreds" of e-mails, text messages, and voice messages from her.  Some of the messages purported to be from an imaginary friend; many were rambling and only barely coherent.[5]  Sometimes, there would be a series of e-mails with the message only in the title or subject line, thus defeating any effort by A.S.R. to avoid them by not opening the e-mail.[6]

---

[4] A.S.R. testified that he was unclear about why A.K.A. was asking to resume contact, "whether it was resuming a romantic relationship or whether it was just wanting to have [his] presence around for emotional support, [he was] not entirely sure."

[5] One e-mail sent from A.K.A.'s cellular telephone (cell phone) said, "More than anything, I'm so, so sorry.  I hope I haven't destroyed everything.  Any damage I do to myself is temporary -- I know that because I know that I have endless reserves of resilience, and will reinvent myself as soon as I find a new home.  My fear was that there were no more new homes to be found, that I had been sent away from the last one and, alone and unbound as Frankenstein's monster, had no choice but to rage and destroy."

[6] For example, on March 22, 2014, A.K.A. sent the following series of e-mails with these "Subject[s]":  at 6:28 P.M., "Please, please, please, talk to me.  I beg you"; at 6:29 P.M., "This is more important to me than anything else in the world"; also at 6:29 P.M., "It's very near the only thing keeping me alive"; at 6:30 P.M., "I cut my neck today.  I can't keep doing this"; and, at 8:17 P.M., "Please forgive me.  I would do anything you ask."

In March, 2015, A.K.A. appeared at a choral ensemble concert where A.S.R. was singing; a few days later, she was at a Cambridge restaurant where A.S.R. was meeting his new girl friend and her parents for the first time. A.K.A. was seated at a table by the window so he saw her immediately when he approached the restaurant; she came outside and they had "a short confrontation." A.S.R. "implored her to stop trying to contact [him] and she implored [him] to resume contact with her." The messages continued. A.K.A. also appeared at a Quaker meeting she knew that A.S.R. sometimes attended.

A.S.R. testified that A.K.A.'s continuous contact made him "extremely afraid a lot of times" to open his e-mails and text messages, or to listen to his voice mail messages and, also, afraid that A.K.A. was going to appear at places where he was going to be. The constant contact caused him, and his family when he talked to them about it, emotional distress, fear, and anger. In many of her messages, A.K.A. spoke of killing herself or said that she was "going to die" (e.g., an e-mail from "throwaway account," "Subject:  I want nothing more than to stick a knife in the back of my neck"). The last communication A.S.R. received from A.K.A. prior to the hearing was on May 12, 2015, an e-mail invitation to A.K.A.'s birthday party sent to a group of people including him.

A.K.A. also testified. She stated that, in early 2014, she was severely depressed; she agreed that she sent each of the e-mails contained in the exhibit packet, including the images of her having cut herself. She sent those e-mails and images to A.S.R. because she "wanted his empathy and his help"; she stated that she never threatened A.S.R. with physical harm or threatened to damage his property. She never threatened to hurt anyone other than herself. A.K.A. testified that, at the time of the hearing, she was "doing much better" and was no longer depressed; her continued attempts at contact with A.S.R. were "much calmer and conciliatory," and her intention in sending those communications was that they could "reach a resolution between [them] that feels satisfactory." She stated that between January and June, 2014, she did not actively seek out physical contact with A.S.R.

During her testimony, A.K.A. further stated that she had appeared at the Quaker meeting, the choral concert, and the programming event for reasons that had nothing to do with A.S.R. She did not know that A.S.R. was going to be at the Cambridge restaurant where she saw him; she had made plans with a friend to meet for lunch, and the friend had suggested that restaurant.

A.K.A. testified that, as to the phrase appearing in the April 24, 2015, transcript of an audio file she sent to A.S.R., which read, "I've been thinking a lot about whether I can find

it in my heart to forgive you, or just thinking about an alternative to violence that feels true," she was "referring to the Quaker tradition of resolving conflicts through means other than physical or spiritual violence"; it did not refer to physical violence. She stated that the phrase, "I want it to be something other than violence that you've done to me," referred to "the fact that [A.S.R.] cut [her] off and tried to force [her] into silence." She testified that the "violence" that she was guilty of was her continued contact attempts with A.S.R. after he specifically had asked her to stop. A.K.A. stated that no matter the outcome of the hearing, she did not intend to contact A.S.R. again.

During cross-examination, A.K.A. did not agree that she continued to contact A.S.R. in an attempt to have him return to a relationship with her; she stated that her intent was to work out a "peaceful resolution" with him. She said that she was not trying to make A.S.R. uncomfortable; she acknowledged that she understood that, since June, 2014, A.S.R. did not want to have any contact with her. However, after seeing A.S.R. at the Cambridge restaurant, she sent an e-mail to his new girl friend; she (A.K.A.) had obtained his girl friend's e-mail address by checking A.S.R.'s OKCupid Internet dating account. She also admitted that, at the time of the hearing, she was still monitoring A.S.R.'s account.

At the conclusion of the hearing, the judge stated in oral findings that he did not find A.K.A.'s testimony to be credible, and that, although he found it a close question whether the e-mails fell within A.K.A.'s rights under the First Amendment to the United States Constitution, in his view the communications were "very violent"; he extended the harassment prevention order that had been issued ex parte.[7]

Discussion. In reviewing a civil harassment order under G. L. c. 258E, we consider whether the judge could find, by a preponderance of the evidence, together with all permissible inferences, that the defendant committed acts that constituted

---

[7] The judge stated:

"Counsel for the defendant, there's language in the communications that I find very violent. 'Restorative justice has worked in places where people actually killed. There's no reason it shouldn't work for us when our injuries are so much more abstract. It's been long enough --' and then you merge that with the letter that she wrote, the April 24 letter -- 'I'm trying to think about an alternative to violence that feels true.' The term violence is used. What am I to take from that?"

The judge continued:

"The United States Supreme Court just ruled on this issue in a case involving language over the Internet, and it is a complex issue and there are First Amendment issues that have been raised; however, I do not find the defendant credible in her testimony, and I think it is done with the -- it does meet the standard that it set out in the case that has been given to me -- in the O'Brien case [O'Brien v. Borowski, 461 Mass. 415 (2012)]. It's a close question, and there are freedom of speech issues, but the communication is a very violent communication, and I'm going to extend the order for one year."

one of the enumerated forms of harassment.  See O'Brien v. Borowski, 461 Mass. 415, 420 (2012); Seney v. Morhy, 467 Mass. 58, 60 (2014).

"Harassment" is defined in G. L. c. 258E, § 1, in several ways, and a plaintiff who proves any one of the various forms of harassment qualifies for an order prohibiting the harassment.[8] The first definition is "(i) [three] or more acts of willful and malicious conduct aimed at a specific person committed with the intent to cause fear, intimidation, abuse or damage to property and that does in fact cause fear, intimidation, abuse or damage to property."  G. L. c. 258E, § 1 (definition of "harassment," subsection [i]) (hereinafter, the first definition).  This is the form of harassment most discussed in recent case law.  See, e.g., O'Brien v. Borowski, 461 Mass. at 425-428; Seney v. Morhy, 467 Mass. at 63-64; Smith v. Mastalerz, 467 Mass. 1001, 1001-1002 (2014); A.T. v. C.R., 88 Mass. App. Ct. 532, 535-536 (2015); Gassman v. Reason, 90 Mass. App. Ct. 1, 7-8 (2016); V.J.

---

[8] Specifically, in G. L. c. 258E, § 1, inserted by St. 2010, c. 23, the statute's definition of harassment provides:

"'Harassment', (i) [three] or more acts of willful and malicious conduct aimed at a specific person committed with the intent to cause fear, intimidation, abuse or damage to property and that does in fact cause fear, intimidation, abuse or damage to property; or (ii) an act that:  (A) by force, threat or duress causes another to involuntarily engage in sexual relations; or (B) constitutes a violation of section 13B, 13F, 13H, 22, 22A, 23, 24, 24B, 26C, 43 or 43A of chapter 265 or section 3 of chapter 272."

v. N.J., 91 Mass. App. Ct. 22, 25-27 (2017); C.E.R. v. P.C., 91 Mass. App. Ct. 124, 125-129 (2017).

This court, in F.A.P. v. J.E.S., 87 Mass. App. Ct. 595, 598-599 (2015), discussed subsection (ii) of the definition of harassment under G. L. c. 258E, § 1 (hereinafter, the second definition). "Under this definition [of harassment], a plaintiff can establish the need for a harassment prevention order in either of two ways that largely overlap. First, a plaintiff can show that a defendant 'by force, threat or duress cause[d the plaintiff] to involuntarily engage in sexual relations.' Second, a plaintiff can prove that a defendant committed any of [ten] specifically enumerated sex crimes, including -- as relevant [there] -- rape of a child, G. L. c. 265, § 22A." (Footnote omitted.) F.A.P. v. J.E.S., supra at 599.[9]

The present case addresses yet another definition of harassment. Two of the enumerated crimes in subpart (B) of the second definition of civil harassment are G. L. c. 265, §§ 43 (stalking) and 43A (criminal harassment). The definition of civil harassment relevant here under this subpart is "an act

---

[9] However, the second paragraph of one of the ten enumerated crimes, G. L. c. 265, § 13F, as amended by St. 2010, c. 239, §§ 71 & 72, also provides that "[w]hoever commits an assault and battery on a person with an intellectual disability knowing such person to have an intellectual disability shall . . . be punished."

that . . . (B) constitutes a violation of section . . . 43A of chapter 265 [criminal harassment]."

In Commonwealth v. Bigelow, 475 Mass. 554, 558-559 (2016), the Supreme Judicial Court stated:

> "The criminal harassment statute punishes 'whoever willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress.'  G. L. c. 265, § 43A (a).  The statute specifies that conduct or acts qualifying as criminal harassment under its terms 'shall include, but not be limited to, conduct or acts conducted by mail.'  Id."
> [Footnote omitted.][10]

The court also stated:

> "A conviction under [G. L. c. 265,] § 43[,] requires proof that '(1) the defendant engaged in a knowing pattern of conduct or speech, or series of acts, on at least three separate occasions; (2) the defendant intended to target the victim with the harassing conduct or speech, or series of acts, on each occasion; (3) the conduct or speech, or series of acts, were of such a nature that they seriously alarmed the victim; (4) the conduct or speech, or series of acts, were of such a nature that they would cause a reasonable person to suffer substantial emotional distress;

---

[10] The text of the statute continues:

"The conduct or acts described in this paragraph shall include, but not be limited to, conduct or acts conducted by mail or by use of a telephonic or telecommunication device or electronic communication device including, but not limited to, any device that transfers signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photo-electronic or photo-optical system, including, but not limited to, electronic mail, internet communications, instant messages or facsimile communications."

G. L. c. 265, § 43A, as appearing in St. 2010, c. 92, § 10.

and (5) the defendant committed the conduct or speech, or series of acts, willfully and maliciously.'  [Commonwealth v.] Johnson, 470 Mass. [300,] 307 [2014], quoting Commonwealth v. McDonald, 462 Mass. 236, 240 (2012)."

Commonwealth v. Bigelow, supra at 561.

Judging by the test set out in Bigelow, A.K.A.'s actions reasonably can be described as criminal harassment.  It is clear that she targeted the plaintiff with a knowing pattern of conduct and speech; she intended to target him with the harassing conduct or speech on each occasion; her conduct and her speech, taken as a whole, seriously alarmed him; her actions were such that they would cause a reasonable person to suffer substantial emotional distress; and she committed the acts and speech wilfully and maliciously.

A.K.A. argues that the judge did not specify three specific acts of harassment.  She is correct that three acts are required.  See id. at 559 n.9.  However, in this civil proceeding where the judge was the fact finder and there clearly was evidence supporting a conclusion that there were many more than three harassing acts, the judge was not required to make written findings specifying the three acts.

Similarly, A.K.A. argues that the judge did not state explicitly that her conduct was malicious and intentional; however, the judge is not required to do so, and his decision to extend the order is supported by the evidence.  Contrary to

A.K.A.'s argument, the decision in Smith v. Mastalerz, 467 Mass. at 1001, is easily distinguished. There, the defendant drove past his former roommate "while she unpacked her vehicle at the front of her home, stopped a few houses away on that street, turned around, drove past her again, and a few seconds later drove by the home again." Ibid. As the court explained,

> "[W]here there was no evidence refuting the defendant's claim that he lived down the street from the plaintiff, we conclude that driving by the plaintiff's home within a very short period of time was one continuous act. Moreover, the judge made no explicit findings, and the record does not permit us to infer, that the defendant's driving by the plaintiff's home was wilful and malicious, directed at the plaintiff, and intended to cause, and in fact did cause, fear, intimidation, abuse, or damage to property."

Id. at 1001-1002.

The present case is very different, with hundreds of communications sent over many months, despite A.S.R.'s pleas that A.K.A. stop. The fact that A.K.A. used a number of different names and addresses to trick A.S.R. into receiving the communications despite his efforts to avoid them is clear proof of the maliciousness and wilfulness of her behavior. In addition, as noted, the judge explicitly disbelieved the defendant's testimony that she appeared entirely by coincidence at various locations where the plaintiff was working or socializing.

A.K.A. also contends that, read in context, her actions do not support a finding that the communications were harassing.

However, as the court in Commonwealth v. Bigelow noted, "In the usual case, whether a communication constitutes a threat or a true threat is a matter to be decided by the trier of fact." 475 Mass. at 567, quoting from United States v. Stock, 728 F.3d 287, 298 (3d Cir. 2013).

It is true that A.S.R.'s testimony about his fear of physical harm was somewhat equivocal. In response to the question, "When you say fear, it's not a physical fear of harm to you, is it?" he said, "Not that much of one. A little bit . . . ." Counsel then asked, "Has she ever been physical with you?" and A.S.R. responded, "She told me once that she fantasized about killing me, but that's it. She's never been -- she's never physically -- I don't think she would physically harm me. I don't think that would happen."[11],[12] However, in O'Brien v. Borowski, 461 Mass. at 420, the court explained that, for criminal harassment, the elements are different from those required for the definition of civil harassment contained in the first definition of harassment under G. L. c. 258E, § 1.

> "Both [the first definition of] civil [harassment] and
> criminal harassment require proof of three or more acts of
> wilful and malicious conduct aimed at a specific person.
> See Commonwealth v. Welch, 444 Mass. 80, 89 (2005) . . .

---

[11] A.S.R. did testify that A.K.A. had threatened many times to hurt herself "[a]nd that continue[d]" at least until the time of the hearing.

[12] The parties agree that there was no threat of damage to A.S.R.'s property.

> ('phrase "pattern of conduct or series of acts" [in G. L.
> c. 265, § 43A,] requires the Commonwealth to prove three or
> more incidents of harassment'). But the definitions of
> [the first definition of] civil and criminal harassment
> differ in three respects. First, there are two layers of
> intent required to prove [the first definition of] civil
> harassment under c. 258E: the acts of harassment must be
> wilful and '[m]alicious,' the latter defined as
> 'characterized by cruelty, hostility or revenge,' and they
> must be committed with 'the intent to cause fear,
> intimidation, abuse or damage to property.' G. L. c. 258E,
> § 1. Only the first layer of intent is required for
> criminal harassment under c. 265, § 43A. Second, the
> multiple acts of [the first definition of] civil harassment
> must 'in fact cause fear, intimidation, abuse or damage to
> property,' while the multiple acts of criminal harassment
> must 'seriously alarm[]' the targeted victim. Third,
> criminal harassment requires proof that the pattern of
> harassment 'would cause a reasonable person to suffer
> substantial emotional distress,' but [the first definition
> of] civil harassment has no comparable reasonable person
> element."

Ibid. This analysis of criminal harassment, therefore, also applies to civil harassment, when the civil harassment alleged consists of acts that constitute a violation of G. L. c. 265, § 43A. G. L. c. 258E, § 1, second definition of harassment, subpart (B).

This record is clear that A.S.R. was seriously alarmed by A.K.A.'s behavior. He testified that "[i]t's made me extremely afraid a lot of times. I don't know if she's going to show up at places. You know, afraid to check my e-mail or anything like that. It's caused me a lot of emotional distress. It's caused my family, you know, who hear about it, a lot of distress, fear, anger. It's been very painful." When asked, "[I]n those

hundreds of e-mails that you say you received -- texts, e-mails, voice messages -- how many times did she threaten to kill herself if you don't come back to her?" A.S.R. responded, "I don't know the exact number.  You know, I don't know if it's always phrased in exactly those terms, but it -- a lot of times."  Counsel asked, "Freezing to death, cutting herself?" and A.S.R. responded, "Yeah.  Things like that.  'I'm going to die.'  You know, just a lot of things like that."

On this evidence, the judge was also warranted in finding that A.K.A.'s actions, given the volume and the nature of the messages, combined with her unexpected appearances in person, would cause a reasonable person to suffer substantial emotional distress.  Indeed, on these facts a reasonable person would have been warranted in fearing for his physical safety.  As noted, the judge found the behavior to be harassing, disbelieving A.K.A.'s testimony that she intended no threat.  There certainly was enough evidence to support that conclusion -- particularly under the civil standard of proof by a preponderance of the evidence.

Finally, we reject the argument that the defendant's actions constitute protected speech under the First Amendment and under art. 16 of the Massachusetts Declaration of Rights. Her communications were not directed at an elected official or even a public figure, but at a private individual.  Contrast

Commonwealth v. Bigelow, 475 Mass. at 562-563. Nor do they express political speech directed to the public at large. In Bigelow, supra at 568 n.21, the court noted that "because the letters were anonymous, [the victim] would have been unable to halt their arrival at her home, such as requesting a block at the post office or, perhaps, seeking a civil restraining order pursuant to G. L. c. 258E." Here, A.K.A. repeatedly evaded A.S.R's efforts to stop communications from her by using other names, telephone numbers, and e-mail addresses and, as noted, by putting the content of her e-mail message into the subject line of the unwanted e-mail, making it impossible not to see it.

In addition, we are satisfied that the evidence was sufficient for the judge to find that A.K.A.'s behavior constituted a true threat. As the court in Commonwealth v. Bigelow explained, reiterating language from O'Brien v. Borowski,

> "[a] true threat does not require an explicit statement of an intention to harm the victim as long as circumstances support the victim's fearful or apprehensive response. . . . Nor does a true threat threaten imminent harm; sexually explicit or aggressive language directed at and received by an identified victim may be threatening, notwithstanding the lack of evidence that the threat will be immediately followed by actual violence or the use of physical force. . . .

> "[T]he 'true threat' doctrine applies not only to direct threats of imminent physical harm, but to words or actions that —- taking into account the context in which they arise —- cause the victim to fear such harm

> now or in the future and evince an intent on the part of the speaker or actor to cause such fear."

Commonwealth v. Bigelow, supra at 566-567, quoting from O'Brien v. Borowski, 461 Mass. at 424-425.  A.K.A.'s harassment was relentless, carried on over a period of months, and frequently contained explicit references to violence, and it therefore satisfies that definition.

Undoubtedly there are many instances of unwelcome contact from a romantic partner (or would-be romantic partner) that would not support the issuance of a harassment prevention order pursuant to G. L. c. 258E.  However, in this case, given the extraordinary number of communications, and the defendant's persistent manipulations over months to have them reach the plaintiff, combined with their frequently violent content, we cannot say that the judge erred in finding the defendant's conduct to be harassing and in extending the order that she stop it.

Order dated June 15, 2015,[13]
affirmed.

---

[13] We note that, although the extension order is dated June 15, 2015, the docket sheet and the transcript reflect that the order was extended on June 5, 2015.