RUBIN, J.
*492 *758 In this appeal from the issuance of two "harassment prevention orders" under G. L. c. 258E, we are faced once again with the consequences of the variance between the plain language of the statute and the narrowing construction given the statute in O'Brien v. Borowski, 461 Mass. 415, 961 N.E.2d 547 (2012) ( O'Brien ).
Chapter 258E and its limiting construction. As it reads in the statute books, G. L. c. 258E provides that a protective order shall issue based upon a finding of "harassment." The statute defines *759 harassment to mean "[three] or more acts of willful and malicious conduct aimed at a specific person," each of which must be "characterized by cruelty, hostility or revenge" and "committed with the intent to cause fear, intimidation, abuse or damage to property and that does in fact cause fear, intimidation, abuse or damage to property." G. L. c. 258E, § 1, inserted by St. 2010, c. 23. (The statute also provides independently for issuance of an order based on acts that "by force, threat or duress cause[ ] another to involuntarily engage in sexual relations," or that constitute violations of statutes prohibiting indecent assault and battery, rape, rape and abuse, assault with intent to commit rape, enticement, stalking, criminal harassment, and drugging persons for sexual intercourse. G. L. c. 258E, § 1. That provision is not at issue in this case.)
The statute was passed to fill a gap left by G. L. c. 209A, which allows individuals to seek abuse prevention orders against family or household members. Violation of such an order is punishable as a crime. However,
"[a] person who is abused by someone other than a 'family or household member' does not qualify for a protective order under c. 209A and could obtain a restraining order only by seeking relief in the Superior Court under Mass. R. Civ. P. 65 .... Violation of such a restraining order may constitute a contempt of court, but is not a crime.... Chapter 258E was enacted in 2010 to allow individuals to obtain civil restraining orders against persons who are not family or household members, and to make the violation of those orders punishable as a crime."
O'Brien, supra at 419, 961 N.E.2d 547.
The seriousness of an order under c. 258E is reflected not only in the fact that violation is a criminal offense, but in the fact that records of all such orders are entered in the Statewide domestic violence registry from which they may never be removed even if there was an insufficient legal or factual basis for their issuance. See G. L. c. 258E, § 9 ; J.S.H. v. J.S. 91 Mass. App. Ct. 107, 109-110, 71 N.E.3d 910 (2017) ( J.S.H. ).[2] Such an order thus has significant and essentially indelible consequences for the person against whom it issues.
*760 Unsurprisingly in light of the language of the statute, our courts have *493 issued orders based upon a variety of abusive and intimidating willful and malicious conduct characterized by hostility, amounting to what, in colloquial terms, we would describe as harassment. In 2012, however, in O'Brien, the Supreme Judicial Court found that the language of the statute reached some activity protected by the First Amendment. O'Brien, 461 Mass. at 420, 961 N.E.2d 547. Rather than striking the statute down, the court gave it a "narrowing construction." Id. at 421, 961 N.E.2d 547. Although, confusingly, the law remains on the books in unamended form, under O'Brien, a court may not issue a protective order thereunder simply on the basis of three acts characterized by hostility causing and intended to cause fear, intimidation, or abuse committed willfully and maliciously and aimed at a specific person. Rather, each of the three willful and malicious predicate acts aimed at a specific person must be either a "true threat" -- which is what is at issue here, as in the other decided appellate cases addressing the statute -- or "fighting words" -- which are not at issue here and which we can put to one side for present purposes, id. at 425, 961 N.E.2d 547 -- at least where the predicate act is not an intentional act either of unlawful violence, i.e., acts that "attempt[ ] to cause or caus[e] physical harm," or that causes property damage that meets the other requirements of the statute. G. L. c. 258E, § 1. To qualify as a true threat, a threat must demonstrate "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," Virginia v. Black, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) ( Black ) -- under c. 258E, the specific individual to whom the alleged predicate acts are directed. Further, to support an order under c. 258E, the true threats cannot be threats to do just any kind of harm; they must be intended to cause "fear of physical harm" or --again not relevant here -- "physical damage to property." O'Brien, 461 Mass. at 427, 961 N.E.2d 547. Even threats intended to do anything else to the specific individual will not amount to predicate acts for purposes of c. 258E, notwithstanding the language of the statute, and only a threat intended to cause fear of physical harm (or physical property damage) can qualify as one of the three predicate acts for purposes of c. 258E. This is true even when the act is not characterized as one intended to cause "fear" (i.e., of physical harm), but as one intended to cause "intimidation" or "abuse" as well, even though the colloquial meaning of those two words is dramatically broader. See id. at 425, 426-427, 961 N.E.2d 547 (" 'Intimidation in the constitutionally proscribable sense of the word is *761 a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.' [ Black, supra] at 360 [123 S.Ct. 1536].... Where the acts are aimed at a specific person, an intent to cause 'abuse' is certainly consistent with a true threat, because abuse is defined in [c. 258E] as 'attempting to cause or causing physical harm to another or placing another in fear of imminent serious physical harm.' G. L. c. 258E, § 1"). Further, even when there are three predicate true threats intended to cause fear of physical harm, they must together in fact cause such fear. See id. at 426 n.8, 961 N.E.2d 547.
Since O'Brien, our appellate courts have repeatedly held in appeals from issuance of orders under c. 258E that conduct that might be considered harassing, intimidating, or abusive in the colloquial sense, and that thus might support issuance of an order under the plain language of the statute, was not adequate to meet the standard spelled out in O'Brien. See, e.g., *494 Seney v. Morhy, 467 Mass. 58, 64, 3 N.E.3d 577 (2014) (little league parent "verbally attacked and threatened to have [plaintiff, an assistant coach,] thrown off the team in front of numerous other parents" and "attacked [plaintiff's] personal being in front of every single parent"); Van Liew v. Stansfield, 474 Mass. 31, 38-39, 47 N.E.3d 411 (2016) (defendant publically accused plaintiff of being corrupt and a liar and during telephone call loudly called plaintiff uneducated and stupid); Gassman v. Reason, 90 Mass. App. Ct. 1, 9, 55 N.E.3d 997 (2016) (repeated complaints from downstairs neighbor about loud piano playing by neighbor in upstairs apartment); C.E.R. v. P.C., 91 Mass. App. Ct. 124, 127-128, 71 N.E.3d 915 (2017) (loud music played at all hours of night, use of strobe light at night, and installation of security cameras on property by tenants).
The evidence and the orders at issue. With this as background, we turn to the facts of this case. In this case, the plaintiff, A.R., obtained orders under c. 258E against the defendants, L.C. and J.C., his mother- and father-in-law. In his affidavit he alleged that the defendants accompanied their daughter (his wife, from whom he was separated) when the parents exchanged their young child, over whom they shared legal and physical custody, in public places. According to A.R., there were several incidents in which L.C. would video record the exchanges, even though A.R. asked her not to, and the defendants would block his exit from the commercial establishment in which the exchange was taking place. First, A.R. averred that on April 8, 2016, during one of these incidents, his daughter had removed her boot and he had *762 difficulty putting it on. L.C. raised her voice, said, "[Y]ou put the boots on her," and stuck the video recorder within three feet of his face. Next, A.R. describes another incident that same day in which his daughter's coat zipper was stuck. A.R. and L.C. got into an argument and L.C. "brushed right past [him], ... and placed [his] daughter into the stroller," and yelled at him, "[T]he zipper is broken, repair it. You must repair it." A.R. also describes another, undated incident from about two weeks before he signed the affidavit on April 13, 2016. L.C. videotaped the whole exchange and stuck the video recorder in his face. J.C. "became noticeably agitated, glared at [him] and stated 'Are you sure you [are] able to take best care of her?!' in a firm, nasty, condescending tone." He asked the defendants to move out of his way, they did not, and they finally moved after he asked again. A.R. stated that he believed that this behavior was an attempt to provoke a response. A.R. describes a final child exchange incident from about a month before the affidavit was signed in which L.C. stuck the video recorder in his face and both defendants blocked the exit, again moving only after he asked a second time. According to A.R., J.C. "gave [him] an intense look and made a derogatory comment and stance toward [him]."
In addition to the incidents at the child exchanges, A.R. described an encounter in the late fall or early winter 2013 in New York, while he and his wife were visiting the defendants, during which L.C. "chopped" him, scratched him, kicked him, and threw him down the stairs. He further stated that J.C. has punched and thrown him on the ground three times (once threatening to "destroy [him]"), twice punched him in the jaw, and once threw him down the stairs. The record does not disclose the number of separate incidents in which these events allegedly took place, but A.R. does aver that each instance of each type occurred on "separate occasions" from each other. Since A.R. described three instances of J.C. punching him and throwing him on the ground, A.R. thus describes at least three separate incidents involving J.C. that are unrelated to the *495 child exchanges. He did not say when the events with J.C. took place. On April 13, 2016, an ex parte, temporary order pursuant to c. 258E was entered.
At the two hearings on extending the order,[3] A.R. gave testimony similar to what was in the affidavit and clarified that some *763 child exchanges took place at a drycleaners and others at a CVS store. He described the April 8 zipper incident in more detail, stating that L.C. argued with him over whether the zipper of the child's coat was broken and had a "nasty and aggressive" demeanor. He also testified to a different incident, on March 31, 2016, which presumably was the same incident as the incident described in the affidavit as having occurred two weeks before it was signed, in which L.C. aggressively videotaped him and J.C. blocked the door. Videos of various child exchanges were shown, including those of the March 31 incident and April 8 incident involving the zipper. Most videos are security camera footage from the drycleaners and are date-stamped, but lack audio. Three videos were recorded at CVS on L.C.'s "smart phone" and have audio, but are not date-stamped. In some of the videos, but not the March 31 incident or the April 8 incident involving the zipper, A.R. agreed at the hearing that there was no harassing behavior by either defendant.
The videos do not fully corroborate A.R.'s description of the events as he recounted them in his affidavit. There is no video of an incident involving the child's boot on April 8. There is a phone-recorded, boot-related incident that L.C. in the video describes as occurring on March 27, but there is no evidence of L.C. raising her voice, blocking the door, or otherwise threatening A.R.[4] The video of the April 8 zipper incident lacks audio, so it cannot corroborate (or contradict) A.R.'s sworn statement that L.C. yelled at him, "[T]he zipper is broken, repair it. You must repair it." However, the demeanor of the parties is consistent with their arguing over something, and A.R. does appear to be having trouble with the zipper. Because the March 31 video also lacks audio, it does not corroborate (or contradict) A.R.'s statement that J.C. made a derogatory comment towards him or that he requested that the parties move out of his way. Contrary to A.R.'s sworn statement, however, there is no point in the March 31 video at which J.C. blocks his exit in anything resembling a threatening manner. While it is possible, given the parties' positioning and the timing of the events, that L.C. did not move out of the way when *764 asked, the same is not possible for J.C.[5] There is also no video in which we can hear J.C. making a derogatory comment towards A.R.,[6] and no video in which J.C. takes any physical *496 stance that could be interpreted as threatening.
At the hearings, A.R. also testified to the fall or winter 2013 incident with L.C. described in his affidavit. In addition, he stated that J.C. had thrown him down the stairs, punched him, hit him in the upper back, and body slammed him "more than twice." As in the affidavit, he did not say when these events involving J.C. occurred.
At the end of the hearing, the judge issued two orders. With respect to L.C., the judge said in full, "[A]fter a 2 day hearing, + hearing from the [plaintiff], viewing of videos of incidents-The court finds by a preponderance of the evidence that the defendant has harassed the [plaintiff] on more than 3 occasions exceptionally by videoing all of the drop off + pickups." With respect to J.C., she said in full, "[A]fter a 2 party hearing-with video evidence + testimony of [plaintiff] + argument from the defense attorney, court finds by a preponderance of the evidence that the defendant [J.C.] has harassed the [plaintiff]."
Discussion. In neither case did the judge specify what three acts within the judicially narrowed meaning of c. 258E supported her conclusions about either defendant, something we have seen repeatedly in appeals from the issuance of c. 258E orders. We have viewed each of the videos admitted into evidence. They demonstrate annoying and provocative action on the part of the defendant L.C. She accompanies her daughter for pick ups and drop offs of her grandchild and, using a smart phone, she audio and video records A.R. during these interactions, despite A.R.'s repeated request that she not do so.[7] At times she places the phone within a foot or two of A.R. She insists without warrant that A.R. address problems with a zipper on the child's coat or with the child *765 having taken off her boots. A.R.'s counsel in closing during the June 14 hearing said:
"Imagine feeling -- how would you feel -- or anyone would feel, trying to pick up, drop off their daughter, just having three people stare at you and video-recording you. Just waiting for you to screw up. Just waiting for you to use that evidence against him, just waiting to show [the child] crying when daddy's trying to fix something. It's all to harass [A.R.]. There's no need for it."
We agree with counsel's description of L.C.'s conduct. And A.R. may well have had available to him other avenues of legal recourse. For example, he might have returned to the Probate and Family Court seeking an order that these transfers occur in settings where L.C. was less likely to act in such an aggressive and provocative way, for example, at a police station. But although "[t]he inclination to issue an order for the parties to stay away from one another, concluding that such an order cannot do any harm, is understandable," given the "significant collateral consequences for a defendant, consequences that cannot be undone completely, even when a court later determines that the order should not have issued in the first place," judges must take care to adhere to the standard set out in O'Brien. Gassman, 90 Mass. App. Ct. at 8, 55 N.E.3d 997.
While L.C. was certainly "harassing" the plaintiff in the colloquial sense, only two videos contain any conduct that could even arguably be seen as threatening the plaintiff with physical harm such that the conduct *497 amounted to a predicate act of harassment as that word in the statute has been narrowed by the Supreme Judicial Court. First, in the March 31 video, after recording within inches of A.R.'s face, for a few brief moments after the transfer of the child to A.R. at a drycleaners, L.C. and her daughter might have been standing in the way of the door by which the plaintiff could exit the store. Second, in the April 8 video involving the zipper, L.C.'s aggressive pulling of the child toward A.R., coupled with L.C.'s demeanor towards him, might be seen as threatening A.R. with physical harm.
The judge's written basis for the order against L.C. was three acts of harassment "exceptionally by videoing all of the drop off [and] pickups." The meaning of this phrase is not entirely clear to us. As our description of the test for harassment under the narrowed statute makes clear, merely videotaping the drop off and *766 pick up of a child in a contentious divorce in public does not amount to an act of harassment. If we read the judge's order to encompass only conduct observed on the videotapes, and if we assume that the acts in the March 31 and April 8 videos meet the test for harassment, there are still only two predicate acts. There is of course also the incident A.R. described in which L.C. chopped him, scratched him, kicked him, and pushed him down the stairs, but the judge made no finding as to whether this third incident occurred, which L.C. denies, and it is not clear whether the judge intended the order to be based solely on L.C.'s conduct in videotaping the drop offs and pick ups of the child. Because clarification from the judge thus is necessary, the case against L.C. is remanded for further proceedings consistent with this opinion.
As to J.C., the judge's order does not specify what the three predicate acts of harassment were. There is no evidence in the videos of harassment by J.C. A.R. averred and testified to at least three unrecorded incidents involving J.C. punching him and throwing him to the ground that could amount to at least three separate predicate acts that are unrelated to the child exchanges. However, nothing in the order implies that the judge found that these unrecorded events occurred, and we decline to determine sua sponte whether they did and hence whether the requisite three instances of harassment took place. Consequently, we will remand the case involving J.C. so that the judge may clarify what the basis was for her conclusion that the statutory requirements were met with respect to J.C.
To the extent that the judge did in fact intend to rely upon the unrecorded incidents in issuing either order, we note that the judge sustained an objection on relevance grounds to inquiry on cross-examination of A.R. into "mental health issues" that, the defendants argued, could have affected his memory. The judge stated that the "videos speak for themselves," but acknowledged that there were allegations of conduct not captured on the videos. To the extent the judge would rely on these events not on video, ability to recall is obviously relevant and, to the extent there is foundation for it, the defendants on remand will be entitled to a further hearing at which they must be allowed to cross-examine A.R. about these issues.
Conclusion. The cases are remanded for the judge to clarify the basis for extending the c. 258E order in each case. Unless her basis for extending either order included unrecorded incidents as *767 described herein, such order shall be vacated. If either of the orders was extended on the basis of *498 such unrecorded incidents, she shall hold a further hearing with respect to that order or orders. If, after that hearing, the judge concludes that either order is adequately supported as described in this opinion, the supported order or orders may remain in place, otherwise the judge shall vacate the order or orders.[8]
So ordered.

There is a narrow exception for cases in which a defendant can make a clear and convincing showing that the order was obtained by fraud on the court. See J.S.H., supra at 111, 71 N.E.3d 910.

The first hearing was held on May 19, 2016, and the c. 258E order was, according to the judge, continued "by agreement of the parties" until June 9, 2016, when the second hearing was held.

L.C. in this video did request that A.R. put the boots on the child, which A.R. averred that she did on April 8. Because of this and because there is a separate child exchange on April 8, also described in the affidavit, one can infer that A.R. mistakenly described the March 27 boot incident as having occurred on April 8.

The only point at which J.C. stands between A.R. and the door is when J.C. enters the drycleaners, as A.R. was there first. After fixing the child's coat, J.C. immediately moves out of the way. By the time A.R. secures the child in her stroller and is ready to leave, J.C. is well clear of the door.

J.C. appears in one of the videos that lacks audio, so it is possible that he made a derogatory comment in that video. A.R. never said what this comment was.

L.C.'s behavior in this regard may be understood in part by reference to the fact that her daughter had had a G. L. c. 209A restraining order against A.R., which was vacated in part by a probate judge when the judge ordered A.R. have unsupervised visitation with the seventeen month old child.

The orders had expired during the pendency of this appeal. The parties informed us at oral argument that the judge extended them for another year. Those extended orders are not before us and we do not know the basis for the extensions, but, to the extent our decision has implications for them, the parties may address the issue on remand.