NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-560                                             Appeals Court
17-P-1479


ELLIS E.  vs.  FINN F.[1] (and a companion case[2]).


Nos. 17-P-560 & 17-P-1479.

Middlesex.      December 4, 2018. - November 8, 2019.

Present:  Meade, Agnes, & Englander, JJ.


Civil Harassment.  Harassment Prevention.  Protective Order.



Complaint for protection from harassment filed in the
Superior Court Department on June 8, 2016.

The case was heard by Elizabeth M. Fahey, J.


Michael R. Byrne & Robert J. Cordy for the defendant.
Ellis E., pro se.
Daniel J. Cloherty for President and Fellows of Harvard
College.


AGNES, J.  The defendant and his employer, Harvard

University (university), appeal from civil harassment prevention

_____

[1] The parties' names are pseudonyms.

[2] The companion case is between the same parties.

orders issued pursuant to G. L. c. 258E, § 3 (a).[3]  This case presents another opportunity for us to clarify the requirements for obtaining relief under that statute,[4] as well as the scope of relief that is available.  The plaintiff was a fifth-year graduate student in the Ph.D. program in the biological and biomedical sciences program (BBS program) at the university.  The defendant is a professor and the director of the plaintiff's research laboratory (lab) at the university.

The case involves the plaintiff's relationship with the defendant and other lab members.  The plaintiff sought a c. 258E harassment prevention order against the defendant in June of 2016, alleging a series of actions described more fully in the discussion section, infra.  In August of 2016 a Superior Court

---

[3] As a preliminary matter, the plaintiff argues that the university is a nonparty that does not have standing to appeal. As discussed infra, however, the judge purported to add the university as a party and used the plaintiff's complaint for protection from harassment to impose obligations on the university.  Under these circumstances, the defendant's employer certainly has standing to appeal.  See Corbett v. Related Cos. Northeast, 424 Mass. 714, 718 (1997) (even nonparties have standing to appeal if they have "a direct, immediate and substantial interest that has been prejudiced by the judgment, and [have] participated in the underlying proceedings to such an extent that [they have] intervened 'in fact'").

[4] As we have previously noted, "[O]ur appellate courts have repeatedly held in appeals from issuance of orders under c. 258E that conduct that might be considered harassing, intimidating, or abusive in the colloquial sense" is not sufficient to support a harassment prevention order.  A.R. v. L.C., 93 Mass. App. Ct. 758, 761 (2018).

judge found that the defendant had met the standards for harassment under G. L. c. 258E, and entered a harassment prevention order against him; in addition, the judge ordered that the plaintiff "immediately be fully restored to his position and research . . . with all [his] assistance, equipment, and supplies." Thereafter the judge entered six more orders directed to the plaintiff's relationships with the university, culminating in an order that the university, among other things, "vacate" the plaintiff's withdrawal from the university and "restore" the plaintiff's status as a graduate student. Because the evidence does not support the conclusion that the plaintiff was harassed by the defendant, as defined by c. 258E and subsequent case law, and because the expansive relief ordered by the Superior Court judge far exceeded that authorized by the statute, we vacate the harassment prevention orders.

1. Background. a. Facts. There are two overarching but interrelated factual narratives. The first is that on March 10, 2016, the plaintiff filed a confidential complaint with the president of the university alleging research misconduct by the defendant and other lab members. The second is that at roughly the same time, if not before, the plaintiff's relationships with at least some of his fellow lab members became acrimonious, which eventually led to serious disruptions within the lab.

As to the research misconduct complaint, the plaintiff alleged the knowing publication of false data by the defendant and two other Ph.D. candidates.  In accordance with the university's process for investigating such complaints, two university officials met with the plaintiff on March 25 concerning his allegations.  The defendant did not become aware of the complaint until May 4, when university officials advised him that he was the subject of an inquiry into allegations of research misconduct.  Although the defendant was not advised that the plaintiff was the complainant, the defendant suspected that the complainant was the plaintiff.  The university's investigation did not substantiate the plaintiff's allegations; this fact was communicated to the defendant on or around May 16.

From March through June of 2016, the plaintiff's relationship with the lab, and the lab members, deteriorated significantly.  The plaintiff wrote an e-mail to the defendant on April 6, 2016, in which he described hostile interactions between himself and three different lab members, which at that point had been occurring for at least several weeks.  The plaintiff's complaints included that other lab members had called him "immoral" and a "hypocrite," and that he had been accused both of lying about a potential collaboration and of trying to steal a lab member's research assistant.  The plaintiff also stated in this e-mail that some lab members had

stopped communicating with him altogether. On April 21, the plaintiff and the defendant met with a university ombudsperson to discuss ways to alleviate the tensions. The meetings were initially considered positive and plans were made for a future meeting between the plaintiff and the other lab members, but the plaintiff later declined a joint meeting, and relations did not improve.

In granting the c. 258E order, the judge found five acts of harassment. The first two were based on the following. In early May, around the time when the defendant definitively learned of the research misconduct allegations, the defendant met with two of the lab members whom the plaintiff had accused of acting hostile toward him; both of these lab members also had been accused of involvement in the defendant's research misconduct. The judge found that on May 10, at the defendant's suggestion, the two lab members spoke to William Lensch, the executive director of the department of stem cell and regenerative history, and expressed concerns about the plaintiff's behavior -- including concerns regarding the plaintiff's welfare, their personal safety, and the potential sabotage of their work. The judge found that the defendant's suggestion that the lab members speak with Lensch was the first act of harassment. Later on May 10, the defendant spoke with Lensch regarding the plaintiff, and expressed his own concerns

about the plaintiff's erratic behavior.  The judge found that this conversation was the second act of harassment.  The judge also found that these acts were done maliciously with the goal of intimidating and discrediting the plaintiff.

These May 10 conversations with Lensch started a series of communications among several university administrators, and culminated in a meeting between the plaintiff; David Cardozo, the associate dean for graduate studies; and Susan Dymecki, the head of the BBS program.[5]  The meeting was reportedly productive, but any positive effects were short lived.  On May 18, the plaintiff sent an e-mail to the defendant and ombudsperson Melissa Brodrick, in which the plaintiff requested that future meetings with his fellow lab members be supervised, that he receive lab mice for his experiments, and that he receive additional research assistants.  The defendant believed that the tone of the e-mail was confrontational.  He informed Cardozo and Lensch of the e-mail and indicated he was still concerned about the plaintiff's behavior.  The plaintiff, Cardozo, and Dymecki had another meeting on May 20 to discuss the situation -- plans were made to meet again on May 25.

---

[5] Lensch relayed the reports to David Cardozo.  Cardozo reached out to several more people to inquire about the plaintiff's mental health, including the lab administrator, Harvard University health services, and the defendant.

On May 21, the plaintiff stopped coming to the lab altogether; he canceled the May 25 meeting with Dymecki and Cardozo, he canceled a meeting with the defendant, and he canceled an appointment with his psychiatrist at the university health services (HUHS).  Following the cancelations, Dymecki and Cardozo contacted the plaintiff out of concern for his welfare.  The plaintiff informed them that he was "alright," but that he would only be "dealing with the [o]ffice of the [p]resident"[6] for now.  He requested that Dymecki and Cardozo refrain from contacting him.

The judge found that the defendant's actions on June 3, 2016, formed the basis of the third, fourth, and fifth harassing acts against the plaintiff.  Over the course of the afternoon on June 3, the defendant reached out to Dymecki and others to express alarm at the plaintiff's "hostile and erratic behavior."[7]  That evening at 8:27 P.M., after deliberating as to the best course of action, the defendant suggested to Dymecki that they should "get advice from a mental health professional."  The judge found that this suggestion from the defendant to Dymecki was the third act of harassment.  After Dymecki contacted HUHS

---

[6] On May 25, the plaintiff sent an e-mail directly to the president of the university, Drew Faust, recounting the tensions with the defendant and others.

[7] The defendant also contacted Lensch, Cardozo, and Brodrick on June 3.

at the defendant's request, a clinician from HUHS called the defendant twice on the evening of June 3.  The defendant told the HUHS clinician that the plaintiff was exhibiting increased paranoia and ideation and that the plaintiff had abruptly canceled several meetings, and the defendant recounted the plaintiff's conflicts with other lab members.  The judge found these two telephone calls to be the fourth and fifth harassing acts.

At 11:15 P.M. on June 3, Dr. Ayse Atasoylu, a physician at HUHS, authorized the temporary involuntary hospitalization of the plaintiff pursuant to G. L. c. 123, § 12.  That authorization was based on information provided to Atasoylu by the HUHS clinician who spoke with the defendant earlier in the evening.  Atasoylu never examined or spoke with the plaintiff prior to authorizing the § 12 hospitalization.  In the early morning hours of June 4, three police officers arrived at the plaintiff's home and brought the plaintiff to Cambridge Hospital against his wishes.  The plaintiff was examined and released several hours later after physicians concluded that he was not at "imminent risk for self-harm."  On June 6, following his release from the hospital, the plaintiff was barred from returning to the lab.

b.  Procedural history.  The plaintiff filed a c. 258E complaint against the defendant on June 8, 2016, based largely

on the G. L. c. 123, § 12, application that required the plaintiff to undergo a mental health evaluation and his subsequent expulsion from the lab. Following two hearings on June 27 and July 6, 2016, the judge found that the defendant engaged in the five aforementioned acts of harassment. The judge thus entered an order on August 26, 2016, that required the defendant "to stay at least [one hundred] feet away from plaintiff and have no contact, direct or indirect, with plaintiff." The order further provided that "[p]laintiff is to immediately be fully restored to his position and research in the . . . [l]ab with all the assistance, equipment, and supplies he had on March 10, 2016."

The difficulty in following the judge's order soon became apparent, and led to a lengthy and convoluted procedural history. In particular, the August 26 order effectively barred the defendant from engaging in his profession, as he could not access his lab (or his office and classroom, which were adjacent to his lab). Twice the defendant moved to vacate or modify the order, arguing that his actions did not amount to harassment and that the scope of the order was unreasonable.[8] The university also filed a memorandum as amicus curiae, arguing that the

---

[8] The defendant also sought to stay the order pending appeal.

August 26 order was improper because it imposed obligations on the university, which was not a party to the case.

On September 9, 2016, the judge issued the first of several modifications to the original order, allowing the defendant to work in his office and an adjacent classroom, but providing no additional relief.  The parties were unsatisfied with the modification, and so numerous additional hearings were held between September and November in an attempt to craft a workable order.  First, on October 4, the judge tried moving the plaintiff to a different lab.  Then, on October 17, the judge reversed course and ordered the plaintiff to remain in the defendant's lab, and under the defendant's direct supervision.[9] Also on October 17, the judge removed the one hundred foot stay-away order and tried to impose a schedule on the parties' lab access -- allowing the defendant to access the lab between 7 A.M. and 10 A.M., Monday through Friday, and preventing the plaintiff from accessing the lab during those times.  On December 13, the judge reversed course again, and removed the provision limiting the defendant's access to the lab, reinstituted the one hundred foot stay-away order, and imposed additional requirements on the university, including requiring

---

[9] The judge also ordered that a third party supervise any necessary meetings between the plaintiff and the defendant.

the university to provide the plaintiff with two research assistants and the mice necessary to complete his research.

The defendant filed a motion for a partial stay of the December 13 revised order with a single justice of this court. On January 30, 2017, the single justice vacated the first paragraph of the December 13, 2016 revised order and reintroduced the provision restricting the defendant's lab access to from 7 A.M. to 10 A.M. on weekdays.[10]  The case then returned to the Superior Court.

In the months that followed, the plaintiff failed to satisfy a number of the university's academic requirements, such as meeting with his dissertation advisory committee (DAC) or his academic advisor, which resulted in the plaintiff being placed on academic probation.  On May 15, 2017, after failing to appear at a meeting with his academic advisors, the plaintiff was withdrawn from the university.  The university then moved to intervene in order to modify the December 13 revised order.  As the university argued, because the plaintiff was no longer a student, the university could not comply with the requirement

---

[10] The full paragraph reads:  "[The defendant] is to have no direct contact with [the plaintiff], except that 1) [the defendant] is allowed access to [the building in which his research lab is located] only from 7 A.M. to 10 A.M. Monday through Friday, and to attend [l]ab [m]eetings, i.e., those meetings to which all those [the defendant] supervises are invited, and 2) as otherwise provided in [p]aragraph [three]."

that the plaintiff "remain in his position and research in [the defendant's research lab]."[11]

More orders followed. On May 31, 2017, the judge added the university as a party to the case and denied their motion to modify the December 13 revised order. The judge also allowed a motion filed by the plaintiff to restrain the university from taking any action with regard to the plaintiff's immigration status. On June 19, 2017, the judge amended the December 13 order once again to require the university to provide the plaintiff with "full access" to two research facilities.

Finally, on July 14, 2017, after a hearing on several pending matters, the judge entered a revised order that was substantially similar to several of the previous orders,[12] including that the plaintiff "be returned in all respects to the status quo he enjoyed as of March 10, 2016." Notably, in order to effectuate that relief, the July 14 order required the university to, among other things, vacate the plaintiff's withdrawal from the university and inform the United States

---

[11] Around the same time, the plaintiff also filed a motion to add the university as a party and filed additional motions to prevent the university from disturbing his student visa.

[12] The July 14 order also required the defendant to stay one hundred feet from the plaintiff and have no contact with the plaintiff except for periodic lab meetings in the presence of a third party, and precluded the defendant from using the plaintiff's research in any manner.

Department of Homeland Security that the plaintiff's status as a graduate student was restored, have the plaintiff's access to all university facilities restored, remove any security guards at facilities used by the plaintiff that were not in place before March 10, 2016, and obtain two research assistants for the plaintiff.

The defendant and the university filed notices of appeal, as well as motions to stay the judge's orders with a single justice of this court.[13]  We now turn to the issues currently before us.

2.  Discussion.  a.  Requirements for obtaining relief.  We review an order pursuant to G. L. c. 258E to determine whether the judge could conclude "by a preponderance of the evidence, together with all permissible inferences, that the defendant had committed '[three] or more acts of willful and malicious conduct aimed at a specific person committed with the intent to cause fear, intimidation, abuse or damage to property,'" Seney v. Morhy, 467 Mass. 58, 60 (2014), and that those acts did "in fact cause fear, intimidation, abuse or damage to property," G. L. c. 258E, § 1.  Gassman v. Reason, 90 Mass. App. Ct. 1, 7 (2016).

_____

[13] The single justice issued a pair of orders that stayed, pending appeal, all aspects of the previous orders still in effect, with the exception of the requirements that the defendant stay one hundred feet away from the plaintiff and that the defendant refrain from using the plaintiff's research in any manner.

"[T]here are two layers of intent required to prove civil harassment under c. 258E: the acts of harassment must be [willful] and '[m]alicious,' the latter defined as 'characterized by cruelty, hostility or revenge,' and they must be committed with 'the intent to cause fear, intimidation, abuse or damage to property.'" O'Brien v. Borowski, 461 Mass. 415, 420 (2012), quoting G. L. c. 258E, § 1. To avoid constitutional overbreadth, "fear" under the statute has been limited to mean "fear of physical harm or fear of physical damage to property." O'Brien, supra at 427. Someone seeking a harassment prevention order may not avoid this narrowed construction by characterizing the predicate act as one intended to cause intimidation instead of fear. See A.R. v. L.C., 93 Mass. App. Ct. 758, 760-761 (2018).[14]

As indicated, the judge cited five acts in support of the harassment prevention orders: (1) the defendant's May 10 report of the plaintiff's erratic and threatening behavior, (2) the defendant's instigating lab members to make similar reports, (3) the defendant's June 3 suggestion that the head of the BBS program get advice from a mental health professional, and (4 & 5) the two different telephone calls that the defendant had with

---

[14] The plaintiff's complaint for protection from harassment was not premised on abuse or damage to property, and we thus limit our discussion to fear of physical harm.

the health services clinician on the evening of June 3.  Some of these acts, however, cannot be construed as aimed at the plaintiff and committed with the intent to cause fear of physical harm, and none of these acts was the actual cause of any fear of physical harm testified to by the plaintiff.

We first address the defendant's May 10 report of the plaintiff's erratic and threatening behavior and the defendant's instigating lab members to make similar reports.  We assume that the judge's findings regarding the defendant's malicious intent are not clearly erroneous and that the defendant's acts were intended to discredit the plaintiff.  However, these findings go to the first layer of intent only.  The plaintiff also needed to prove by a preponderance of the evidence that those acts were aimed at the plaintiff and were committed with the intent to cause fear of physical harm.  The evidence does not support this conclusion.  The first two acts cited by the judge were oral statements that were not made to the plaintiff or in his presence, and nothing in the record supports an inference that the defendant intended, by these statements, to cause the plaintiff fear of physical harm.  See Seney, 467 Mass. at 63 (e-mail sent to third party "was not directed at [plaintiff]").  See also Petriello v. Indresano, 87 Mass. App. Ct. 438, 446-447 (2015) (false accusation may qualify as harassment only if said to plaintiff).

The last three acts cited by the judge all involve conversations that the defendant had on June 3, in the period leading up to the plaintiff's involuntary psychiatric evaluation. These three acts perhaps present a closer question whether they could satisfy the requirement of intent to cause physical harm. We assume without deciding, though with misgivings, that the plaintiff's fear of being held against his will and subjected to G. L. c. 123, § 12, procedures qualifies as fear of physical harm.[15] We also assume, without deciding, that the judge's finding that the defendant had malicious intent when he had the conversations was not clearly erroneous.[16] However, we conclude that these three oral conversations the defendant had with persons other than the plaintiff do not qualify as "true threats" or "fighting words" under the standard established in O'Brien. O'Brien, 461 Mass. at 422. "[O]nly a threat intended to cause fear of physical harm (or physical

---

[15] To the extent that the plaintiff's complaint for protection from harassment was instead based on his fear that people would believe any rumors regarding his mental health, this fear does not satisfy the constitutional requirements of O'Brien. See O'Brien, 461 Mass. at 427. See also A.R., 93 Mass. App. Ct. at 760-761.

[16] While the plaintiff's sudden retreat from university meetings and the lab could have caused genuine concern, there was also evidence that the plaintiff was responding to inquiries into his well-being and that he indicated to everyone who asked that he was all right. Regardless, our decision does not depend on whether the judge's subsidiary findings regarding the defendant's malicious intent are clearly erroneous.

property damage) can qualify as one of the three predicate acts for purposes of c. 258E.  This is true even when the act is not characterized as one intended to cause 'fear' . . . , but as one intended to cause 'intimidation' or 'abuse' as well."  A.R., 93 Mass. App. Ct. at 760.  A statement or a recommendation made to a mental health professional that another person is in need of mental health services, including possible involuntary confinement in a hospital or mental health facility, without more, is not a "true threat" or "fighting words."

Alternatively, the evidence does not support the conclusion that those three acts were the cause of the plaintiff's fear of physical harm.  The plaintiff testified that his fear arose from his forced mental health evaluation at Cambridge Hospital.  Although the doctors concluded after an examination that the plaintiff did not have any serious mental health issues, the plaintiff testified that he was afraid that he would be declared "mentally insane" and confined to a psychiatric unit.  There was a causal disconnect, however, between the plaintiff's fears and any actions of the defendant.  The defendant lacked the ability to declare the plaintiff "mentally insane" or confine him to a psychiatric unit.  General Laws c. 123, § 12 (a), provides that only certain individuals, such as physicians, may apply to have someone admitted to a mental health facility.  The defendant did not have the requisite qualifications.  The statute further

envisions that anyone who signs an application to have someone admitted to a mental health facility will first examine that person.[17]  See G. L. c. 123, § 12 (a).  The physician who signed the application to have the plaintiff admitted to a mental health facility thus had a duty to exercise her independent, professional judgment when signing that application.  See Reida v. Cape Cod Hosp., 36 Mass. App. Ct. 553, 56 (1994) (discussing examination requirement of statute).  It was this application and the physician's independent, professional judgment in signing it, and not the defendant's statements, that caused the plaintiff's fear of physical harm.  While the plaintiff also may have been afraid that others, including physicians, would believe the rumors regarding his mental health, that does not amount to fear of physical harm (see note 15, supra).[18]

b.  Scope of relief.  While our analysis above requires us to vacate the harassment prevention orders, we nonetheless

---

[17] Under the statute, an examination is not required if it is "not possible because of the emergency nature of the case and because of the refusal of the person to consent to such examination" (emphasis added).  G. L. c. 123, § 12 (a).  The exception does not apply here, where the plaintiff did not refuse to consent to an examination.  See Leininger v. Franklin Med. Ctr., 404 Mass. 245, 248 (1989) (failure to examine not excused, even due to emergency nature of case, where there was no refusal to consent to examination).

[18] We further note that the contrary result could deter people with genuine concerns about someone's mental health from expressing those concerns to a physician, for fear of later being the subject of a harassment prevention order.

address the arguments raised by the defendant and the university regarding the scope of relief that is available through G. L. c. 258E, § 3 (a), as those arguments have been fully briefed and merit discussion. See Cambridge St. Realty, LLC v. Stewart, 481 Mass. 121, 130 (2018). The defendant and the university argue that the scope of the plaintiff's relief under G. L. c. 258E, § 3 (a), was limited to four specified categories and that the terms of the harassment prevention orders far exceeded the scope of those categories.

In deciding this question, we compare the text of G. L. c. 258E, § 3 (a), to the text of G. L. c. 209A, § 3, which applies only in the context of family and household members. General Laws c. 258E, § 3 (a), provides that "[a] person [suffering from harassment] may petition the court . . . for an order that the defendant:  (i) refrain from abusing or harassing the plaintiff . . . ; (ii) refrain from contacting the plaintiff, unless authorized by the court . . . ; (iii) remain away from the plaintiff's household or workplace . . . ; and (iv) pay the plaintiff monetary compensation for the losses suffered as a direct result of the harassment." General Laws c. 209A, § 3, on the other hand, provides that "[a] person suffering from abuse . . . may file a complaint . . . requesting protection from such abuse, including, but not limited to, the following orders" (emphasis added). The fact that G. L.

c. 258E, § 3 (a), does not contain similar language indicating that the four categories of relief specified therein are nonexclusive is a critical change from the language of c. 209A. See J.C. v. J.H., 92 Mass. App. Ct. 224, 230 (2017) (giving weight to omission from G. L. c. 258E of language appearing in G. L. c. 209A).

General Laws c. 258E was "intended to protect victims of 'harassment,' as that term is defined by [G. L. c. 258E, § 1], who could not legally seek protective orders under G. L. c. 209A due to the lack of familial or romantic relationship with the perpetrator." J.S.H. v. J.S., 91 Mass. App. Ct. 107, 109 (2017). Thus, "much of the language in c. 258E is analogous to the language found in c. 209A." Id. One notable exception, however, is the omission of "the all-important phrase 'including, but not limited to' from the introductory sentence of [G. L. c. 258E, § 3 (a)]." J.C., 92 Mass. App. Ct. at 230. "The omission of particular language from a statute is deemed deliberate where the Legislature included such omitted language in related or similar statutes."[19] Id. at 231, quoting Fernandes

_____

[19] The plaintiff's reliance on language in G. L. c. 258E, § 3 (g), that "[a]n action commenced under this chapter shall not preclude any other civil or criminal remedies" is unavailing. This language permits the plaintiff to pursue other claims, through whatever other remedies may be available, but does not expand the scope of relief that is available through G. L. c. 258E, § (3) (a). See J.C., 92 Mass. App. Ct. at 232 ("The language in [§ 3 (g)] also plainly permits an applicant

v. <u>Attleboro Hous. Auth</u>., 470 Mass. 117, 129 (2014). The

omission of the words "including, but not limited to" from the

introductory sentence of G. L. c. 258E, § 3 (<u>a</u>), suggests that a

plaintiff seeking a harassment prevention order pursuant to that

statute is limited to the four categories of relief specified

therein.

Here, there is no doubt that the terms of the harassment

prevention orders far exceeded the scope of the four specified

categories of relief authorized by G. L. c. 258E, § 3 (<u>a</u>). For

example, in addition to limiting the contact between the

defendant and the plaintiff -- a remedy which is authorized by

G. L. c. 258E, § 3 (<u>a</u>) (ii)[20] -- the judge entered orders that

<u>required</u>, not just authorized, the defendant to have specific

contact with the plaintiff by ordering the defendant to continue

supervising the plaintiff in the lab, to meet with the plaintiff

to discuss his research progress, and to invite the plaintiff to

---

for a harassment prevention order to pursue other civil
claims").

    [20] We note that the December 13 revised order included a
provision that the defendant stay at least one hundred feet away
from the plaintiff. A single justice of this court modified
that order to allow the defendant to access his lab during
certain times. When the case returned to the Superior Court,
however, the Superior Court judge entered an order effectively
reinstating the general stay-away order. This the Superior
Court judge could not do, even if otherwise authorized by G. L.
c. 258E, § 3 (<u>a</u>) (ii), in the absence of any changed
circumstances.

lab meetings.  These terms, in addition to exceeding the scope of G. L. c. 258E, § 3 (a) (ii), are at odds with other constraints long recognized by equity courts -- for example, the public policy of not ordering specific performance of a personal service contract.  See G. L. c. 214, § 1A ("The fact that the plaintiff has a remedy in damages shall not bar an action for specific performance of a contract, other than one for purely personal services . . .").  The lengthy and convoluted procedural history that resulted from the judge's attempts at crafting a working relationship between the plaintiff and the defendant amply demonstrates why this sort of specific performance is disfavored.[21]  Regardless, these terms exceeded the scope of the four specified categories of relief authorized by G. L. c. 258E, § 3 (a).

In addition to the terms that required the defendant to have specific contact with the plaintiff, the judge also entered orders that interfered in the university's oversight of the plaintiff.  These terms required the university, among other things, to vacate the terms of the plaintiff's academic probation and to provide him with certain resources.  In view of

---

[21] Insofar as equitable principles come into play when judges issue orders under G. L. c. 209A and c. 258E, judges must be mindful that equity is not "an all-purpose judicial tool by which the 'right thing to do' can be fashioned into a legal obligation possessing the legitimacy of legislative enactment." T.F. v. B.L., 442 Mass. 522, 533-534 (2004).

the result we reach, it is unnecessary to decide the precise parameters of relief available under G. L. c. 258E, § 3 (a) (iv). The terms of the orders in this case certainly have no basis in any of the four categories of relief authorized by G. L. c. 258E, § 3 (a) (iv).

Furthermore, these orders are troubling in light of the fact that the university was not even named as a defendant in the plaintiff's harassment complaint. While the judge purported to bind the university to the harassment prevention orders through Mass. R. Civ. P. 65 (d), 365 Mass. 832 (1974), and later added the university as a party through Mass. R. Civ. P. 71, 365 Mass. 837 (1974), neither of these rules may be used to accomplish either of the intended goals in the context of this case. Both rules contemplate that an order may be lawfully enforced against a nonparty if, for example, the nonparty aids a party in disobeying that order. See, e.g., Bird v. Capital Site Mgt. Co., 423 Mass. 172, 178-179 (1996). That is very different from what happened here, where several terms of the harassment prevention orders applied directly and exclusively to a nonparty (the university), which was not afforded the required procedural protections.[22]

---

[22] The defendant and the university also have addressed whether the terms of the harassment prevention orders could be upheld on the basis of the Superior Court's general equity jurisdiction. We need only to add that the relief discussed

3.  <u>Conclusion</u>.  Acknowledging that the orders entered on August 26, 2016, September 9, 2016, October 4, 2016, and October 17, 2016 were already vacated by the Superior Court judge, we further vacate the December 13, 2016 revised order, the May 31, 2017 orders, the June 19, 2017 amended revised order, and the July 14, 2017 revised order.

<u>So ordered</u>.

---

above was not related to the purpose of G. L. c. 258E.  See <u>J.S.H.</u>, 91 Mass. App. Ct. at 109 (statute exists to protect victims from harassment).  See also <u>Rossi Bros</u>. v. <u>Commissioner of Banks</u>, 283 Mass. 114, 119 (1933) ("It is a maxim that equity follows the law as declared by a statute").