SUPERIOR COURT 
 
 COMMONWEALTH vs. AIDAN T. KEARNEY

 
 Docket:
 @23BP116 / 23BP117 / 23BP118 / 23BP119 / 23BP120 / 23BP123 / 23BP124 / 23BP125 / 23BP126
 
 
 Dates:
 November 9, 2023
 
 
 Present:
 Peter B. Krupp
 
 
 County:
 NORFOLK
 

 
 Keywords:
 MEMORANDUM AND ORDER ON DEFENDANT'S BAIL PETITIONS
 
 

 Defendant Aidan T. Kearney is charged by complaints in the Stoughton District Court with witness intimidation, unlawful picketing to influence a witness, and conspiracy to intimidate a witness. On October 11, 2023, the District Court released defendant on personal recognizance, but ordered him to stay away from and have no contact with the named witnesses and alleged victims. Defendant is now before this court on his petitions under G.L. c. 276, § 58, to vacate the stay away/no contact order. He argues that, because he is a member of the media, the stay away/no contract order is vague, overbroad, and cannot apply to him without running afoul of  the First Amendment, and that the statutes under which he is charged do not put him on fair notice of what constitutes criminal behavior. After two hearings, and after careful review of the parties' numerous filings, including the parties' post-hearing submissions, [1] I largely disagree for the following reasons.

--------------------------------------------

[1]Defendant's bail petition was scheduled for hearing on October 26, 2023. At or just prior to that hearing, defendant filed a brief entitled Petition for Review of District Court Bail Determination (Oct. 25, 2023), with a supporting affidavit from defendant. Defendant's filing raised issues related to the freedom of the press which are not usually raised in a bail

-1-

BACKGROUND

A. Defendant's Interest in the Read Case

Defendant is a local blogger and activist, who operates a number of websites and social media accounts under the name "Turtleboy." Defendant refers to his followers as "Turtle Riders."

Defendant has taken a shine to a case pending in this Court entitled Commonwealth v. Karen Read, 2282CR00117 ("the Read case"). In the Read case, Karen Read ("Read") faces murder charges for the January 2022 killing outside 34 Fairview Road in Canton of her boyfriend, John O'Keefe ("O'Keefe"), who was a Boston Police Officer. The Commonwealth alleges that Read killed O'Keefe by hitting him with her motor vehicle before leaving the scene.

Massachusetts State Police Trooper Michael Proctor ("Tpr. Proctor") is the lead investigator on the Read case. Tpr. Proctor is married to Elizabeth Proctor, who otherwise has no role in the Read case. Witnesses in the Read case include Matthew and Jennifer McCabe (together, the "McCabes"), who were with Read and O'Keefe on the night O'Keefe died; Brian, Julie, Chris and Colin Alpert, who own the property at 34 Fairview Road in Canton, were with

--------------------------------------------

appeal. At the hearing on October 26, 2023, I allowed the Commonwealth an opportunity to address in writing the issues defendant raised. I scheduled the case for further hearing on November I, 2023. On October 31, 2023, as permitted, the Commonwealth filed its Reply and Opposition to Defendant's Petition for Review of District Court Bail Determination. At or just before the hearing on November I, 2023, defendant filed a Supplemental Memorandum in Support of Petition for Review of District Court Bail Determination, which raised new issues, and a Supplemental Affidavit of Aidan Kearney. Notwithstanding defendant's late supplemental filing, the parties agreed to proceed with the hearing on November I, 2023. At argument, I allowed both parties to submit by close of business on November 2, 2023 recordings underlying or relevant to the criminal complaints. I received a thumb drive from the Commonwealth, which I have attached to the Commonwealth's Reply and Opposition; and later received a portable hard drive from defendant, which I have attached to defendant's Supplemental Affidavit. After the hearing on November 1, 2023, and without prior court approval, I also received from defendant a Second Supplemental Memorandum in Support of Petition for Review of District Court Bail Determination (docketed Nov. 2, 2023), and a Final Memorandum in Support of Petition for Review of District Court Bail Determination, both of which seek to explain away or contextualize defendant's words and actions. I have reviewed and considered all of these materials.

-2-

Read and O'Keefe on the night O'Keefe was killed, and/or were interviewed by investigators; and Juliana Nagel, who was at 34 Fairview Road in Canton on the night O'Keefe died.
      
To say defendant has taken a pro-defense position on the Read case is to understate the level of his partisanship and advocacy. See, e.g., "The Karen Read Case in Canton: The Killing that Tore a Town Apart," Boston Magazine (Sept. 27, 2023) ("the Boston Magazine Piece"), available at https://www.bostonmagazine.com/news/2023/09/27/canton-karen-read/(last viewed Nov 8, 2023), which quotes defendant as writing or saying "Karen Read is a completely innocent woman, wrongly charged by corrupt cops who would see her rot in prison in order to cover up a murder of a fellow officer;" and, about the deceased's family: "With the O'Keefes, enough of the fucking pity party for these fucking people The only good part about John [O'Keefe] not being alive is that he doesn't have to be around you useless maggots for a second more. Fuck you. Fuck your high horse. Burn in hell."
      
As these quotes suggest, defendant prides himself on not being a conventional journalist. According to the Boston Magazine Piece, defendant claims that "[t]he beauty of Turtleboy is that I can do things in an unconventional manner that other journalists are restricted from doing. I love being the center of attention and being theatrical and performing. This is what I was made to do." In pursuit of his performative journalism and personal brand, defendant has berated witnesses in the Read case, badgered them although they have indicated that they do not wish to speak to him, and pressured them to change their testimony.[2] Defendant has been able to increase

--------------------------------------------

[2] Journalists generally adhere to codes of ethics that constrain their behavior. See Code of Ethics, Society of Prof. Journalists, available at https://www.spj.org/pdf/spj-code-of- ethics.pdf (last viewed Nov. 8, 2023) ("Ethical journalism treats ... subjects ... and members of the public as human beings deserving of respect. Pursuit of the news is not a license for arrogance or undue intrusiveness."); Statement of Principles, American Society of Newspaper Editors, available at https://www.unm.edu/~pubboard/ASNE%20Statement%20of"/o20 Principles.pd[(last viewed Nov. 8, 2023) ("Journalists should respect the rights of people

-3-

his following substantially - based on monthly page views and viewership - with his confrontational stories, live videos, and inflammatory blog posts about the Read case.

B. Harassing Conduct and Telephone Calls

The criminal complaints against defendant in the Stoughton District Court arise out of defendant's actions reaching out to witnesses and their family members; organizing a caravan of vehicles to drive by the homes of witnesses or family members; and posting veiled threats, sarcastic and rhetorical questions, and other harassing information in the course of his "reporting" on the Read case. These actions are reflected in reports by Massachusetts State Police Det. Lt. Brian Tully ("Det. Lt. Tully") submitted in support of the Stoughton District Court complaints and borne out by the video clips supplied by the Commonwealth after the November 1, 2023 hearing.[3] I describe only some of the actions by defendant set out in Det. Lt. Tully's reports.

Defendant has posted a number of YouTube videos in which he issues veiled threats to various witnesses in the Read case, or encourages his followers to take action with respect to such witnesses. For example, after visiting witnesses' homes in Canton, defendant posted a video online (Episode 594) in which he stated:

It must frustrate him to no end - because I know Brian Albert is watching this right now - to watch me just emasculate his family, time after time, and there's nothing you can do about it. There's just nothing you can do and I'm just gonna keep doing it. I'm just gonna keep, this is not my last trip to Canton. I will be back. And more and more I think people are getting, like a year or so ago

--------------------------------------------

involved in the news" and "observe the common standards of decency"). Defendant does not appear to subscribe to these codes.

[3] Defendant contends that Det. Lt. Tully takes some of his statements out of context. To the extent possible, I have tried to confirm the accuracy of the quotations in this decision by reviewing the actual video clips supplied by the Commonwealth.

-4-

people didn't want to cooperate with the Karen Read defense team 'cause they're like, yeah, it's easier to keep my  head down and, you know, whatever and keep a low profile, but now, you know, now they're like fuck it. You know, we've made people realize that you don't have nothin' to be afraid of.

In the same post, defendant states: "You haven't seen the last of me These people think that I'm fucking around, like I'm mister internet guy, like I'm going to sit here and I'm gonna write blogs all day....No, no, no, no. I live an hour away. I've got a Lexus now I'll be there in an hour, no problem. Get used to it." In another video (Episode 598), defendant states:

I confronted this guy [Chris Albert] a couple weeks ago. This guy has his head on the swivel. Everywhere now he's turnaround like where are they. Got bad news for you Chris. I got really bad news for you. They're literally everywhere. You can't, like, you guys should just stop going out in public. Like that would be my recommendation and it's only going to get worse from here. It's only going to, I did not direct this person to do this. I can't stop 'em. They're everywhere. They don't like you. Nobody likes you. You guys killed someone. Like, you literally killed someone. Not you. You didn't do it. Ya, you raised someone who did it. And, you know, your big bro did it. But like, and you obviously know this and you're helping to cover it up. But I guess you didn't kill anyone so you've got that going for you. So good job, Chris. You just raised a killer . . . Chris, I know where you guys were today. Y'all were in Agawam, weren't you? I got pictures of you in my cell phone. I got people sending me pictures. You guys were at some sort of little league thing in Agawam . . . Alberts, McCabes, all you people were there. So like just, just know that there will be no, life as normal is over.

Defendant traveled to Canton and went to a pizza restaurant owned by Chris Albert. Later, according to Det. Lt. Tully, on a video posted on YouTube, defendant encouraged his followers to order food from Chris Albert's restaurant, but not pay for it.[4] Det. Lt. Tully indicates

--------------------------------------------

[4] After defendant posted this video, Chris Albert's restaurant had a vast increase in the number of telephone orders not picked up or paid for.

-5-

that defendant made other trips to the same restaurant and held signs and confronted people in and around the restaurant.[5]

In April 2023, defendant started writing blog posts about Tpr. Proctor's wife, Elizabeth.

On April 17, 2023, defendant posted on Twitter a statement alleging that Colin Albert ("Colin") is responsible for O'Keefe's murder and that Colin and O'Keefe had a fist fight at 34 Fairview Road. Since then, defendant has authored a number of other posts about Colin, his alleged propensity for violence, and personal information, including where Colin will be attending college.[6]
      
According to Det. Lt. Tully, in a video posted on May 9, 2023, defendant displayed Elizabeth Proctor's cell phone number, and indicated that both Tpr. Proctor and his wife are "lowlifes," "bullies who terrorized people for years," and "deserve to lose their jobs over" the Read case. Defendant publicized the identity of Elizabeth Proctor's employer, which had no involvement in the Read case; identified her position with that company; and posted the main telephone number for the company. Defendant encouraged his followers to leave a review on the company's open Facebook page or Twitter account.[7] The next day, defendant posted a live

--------------------------------------------

[5] In a July 2023 blog post, which contained a video of Chris Albert being confronted by one of defendant's followers, defendant bragged about how the Turtle Riders were sending him pictures wherever witnesses were out in public, including on vacations. He warned witnesses: "You can't leave the fucking country. With like Turtle Riders. We're gonna find you. They're gonna find you...   Your private life is officially over . . . So you need to get used to your new normal. This your new normal." Det. Lt. Tully also describes defendant as saying on the same post: "I was so proud to see turtle riders unafraid, confronting evil like this in the flesh.... [M]urderers, and those who cover for them, do not deserve to live a comfortable life while Karen Read suffers and fights for justice for John O'Keefe."

[6] Since then, Colin has been the target of harassment and intimidation on social media, and employees of the college Colin planned to attend received emails from people who copied defendant's allegations.

-6-

YouTube video during which he repeated Elizabeth's cell phone number, called the number, and left a message that contained the following:

Hi Elizabeth. This is Aidan Kearney calling you back from Turtleboy . . . I noticed that your employer took down their social media pages within minutes of the blog I published about your recent behavior, and I just wanted to see what, is it awkward, were you afraid to go in? Just tell me about your day and why 'cause I, that's the part I don't understand is that you seem to be okay with calling other peoples' work places and interfering with their ability to make a living for themselves, but when it happens to you, it, maybe it's not as fun, maybe it's not as fun. Do you like that? That's what I want to know. Did, did you like that? Because you've been doing that to a lot of other people, and do you think it's fair that it happened to you, dear? Do you regret it? That's what I, do you regret it? And what's your scumbag husband up to right now? Are you going to visit him in prison? Do you think they'll have conjugal visits? Give me a call back when you get this, and we can chat some more. Bye girl.

      On June 6, 2023, defendant traveled to Billerica and confronted the McCabes at a youth sporting event. Defendant later posted videos of the interaction online. Defendant stated in a blog post about the incident that the McCabes "do not deserve to live a normal life and pretend that they weren't involved in murdering a Boston Police Officer." Defendant also bragged in a YouTube video that he had gone to Jennifer McCabe's "kid's lacrosse game and made a scene there and got kicked out . . . because I kept calling her a cop killer."
      
On June 13, 2023, defendant broadcast a YouTube video, which displayed records from Jennifer McCabe's phone from the day O'Keefe was killed, with names next to the phone numbers. These documents had been an attachment to an unredacted defense motion filed in the Read case. Defendant called Michael Proctor's work cell phone, disclosed the telephone number, and left a voicemail which was also broadcast on the YouTube video. In the broadcast voicemail,

--------------------------------------------

[7] When defendant learned that Elizabeth's employer had taken down its social media accounts, he laughed and described it as "the Turtleboy effect."

-7-

defendant asks questions of Tpr. Proctor, describes personal information he knows about Tpr. Proctor, and reiterates that "everybody watching also has your phone number, which again is .. ." and defendant then repeats the cellphone number.[8]

NHTM CVB ,./’PLKJNB DNAround the same time, defendant also called Julie Albert, Chris Albert's wife, harassing her. He left her a voicemail message, commenting on her appearance, asking questions about her interview by the police and how long her family had known Tpr. Proctor. The voicemail closes as follows:

But what I'd really like to know is if you were in the Canton High School Class of 1994, how the hell did Jenn McCabe win best- looking? Were they using Dominion voting machines? Like, how does that happen? And how does that hurt your self-esteem to know that you were in the same graduating class as Jennifer McCabe, and she got best-looking? Like, how does that, how do you cope with that? Do you need therapy? That has to hurt your feelings right, 'cause that would just devastate me if! lost to horse face. So give me a call back when you get this, and we'll talk soon. Bye!

On June 19, 2023, defendant called Chris Albert's phone. When there was no answer, defendant left a voicemail message calling Mr. Albert "Chicken Parm Charlie" and identifying himself as "award winning journalist Aidan Kearney." After asking questions about how long Mr. Albert's family has known Tpr. Proctor, defendant ends the voicemail with the following: [S]o did you guys both have amnesia that day [on February I 0, 2022] that you needed to be formally introduced. Do you often need to be introduced to the people that you have known for a long time? Do you live perpetually in Groundhog Day? I know this was right around Groundhog Day when this happened, so maybe it just kept replaying, and you got to do it all over again the next day. I don't know. I'd like to learn more about this, so if you get back to me, that'd be great, and also, I'll take two blackened chicken parms, extra mozzarella, and we'll see you soon. All right.

--------------------------------------------

[8] Within the next 12 hours, Tpr. Proctor received text messages, phone calls and voicemails related to his involvement with the Read case, with some callers urging Tpr. Proctor's termination. Tpr. Proctor had to change his work cell phone number as a result.

-8-

On June 26, 2023, defendant went to the McCabes' home in Canton and videotaped the residence including videotaping into the home through an open front door. Defendant has also published photographs of one or more of the McCabes' children, photographs of the McCabes on vacation, and a video of a sign on the lawn of Jennifer McCabe's sister in Canton. In the latter video, defendant states:

You were better off staying out of this. This sign, that got me. This sign fuckin' disgusts me. You worthless piles of shit killed John O'Keefe and you have the balls to put these fucking signs in your yard. You have the balls. Why? Because we're fighting for an innocent woman's life You killed John O'Keefe you worthless piles of shit and I'm gonna find you motherfucker. I'm gonna find you. Just know that. You wanna fuckin' dance? We can fuckin' dance. You, I  didn't  know who you were before this . . . I thought you were Jen[nifer McCabe]'s lesbian sister or some shit. I didn't know shit about you. Now we know all about your son Tommy, and Tommy's the lacrosse coach I believe at Canton High School, right? Yeah. Whoa. We can, we can, we can talk about Tommy too. We can pay Tommy a visit too. We're gonna go you're gonna get the whole fucking deal now. All of it. Allie McCabe, she can get it too. They can all get it. We have left the second generation out of this for a bit. That's over. ·

On July 8, 2023, defendant broadcast a live YouTube video during which he called Colin Albert's cell phone, broadcast Colin Albert's cell phone number, and calls Colin Albert "the fucker." When the call went to voicemail, defendant left the following message:

Yo, Colin, it's Turtleboy from them advantage boys. Bang, bang. Bang, bang. Yo, we'll fuck any of you dogs up. Yo, you challenged my boys, them advantage boys, to a fight. Dog. And we about that life, son. We about that life, and we from Sharon, son. Yo, y'all Canton bitches ain't [inaudible], yo. Us Sharon bitches are advantage boys. Nobody be fucking with us and shit, dog. So, yo, call me back. No, but seriously, it's Aidan Kearney from Turtleboy daily news. I just want to know were you the one who killed John O'Keefe or was that your Uncle Brian. Who hit him first? Who hit him with the back of the head with the thing? Are you worried that you're going to go to jail for the rest of your life and that you  won't be able to play football at Bridgewater State next year? Love

-9-

to have a conversation with you. Your, your dad kicked me out of your pizza shop, and I didn't get to eat his mediocre chicken parm, so I just wanted to know if you could talk to me about that, and maybe you could tell, maybe you and I could go for a ride. We could find them advantage boys, bang, bang. I don't know, so give me a call when you get this. Bye.

After leaving this message, defendant spoke to his followers on the same video and reminded them that they had heard Colin Albert's telephone number and that they could replay the video to get his telephone number.

C. Defendant Organizes Drive-by of Homes

Defendant organized and publicized a "Rolling Road Rally" to bring his followers to the homes of witnesses and the lead investigator in the Read case. At about noon on July 22, 2023, defendant met a number of other vehicles at a Shaw's in Norwood. He live-streamed the vehicle caravan, representing that there were 100 to 200 people in the caravan of vehicles.[9] The vehicles first drove to Brian Albert's residence in Norwood. During the video, defendant bragged about being able to locate the witnesses wherever they travel.
      
The second location was the Proctors' home. The Proctors were not at home. Defendant stayed at that location for about seven minutes. During that time, defendant used a megaphone and stated that Tpr. Proctor had "framed" Read and stated personal information about Tpr. Proctor's family. While in front of the Proctors' home, members of the protest, which was organized and fomented by defendant, walked on the Proctors' lawn and spit on his driveway according to Det. Lt. Tully.

--------------------------------------------

[9] Video clips that the Commonwealth and defendant submitted to the Court after the November I, 2023 hearing show a crowd of people on the street with defendant at various stops.

-10-

      The third location was the McCabes' home in Canton, where they live with their four children. Defendant spent about eight minutes in front of the McCabes' home. On his video, defendant said that Jennifer McCabe is going to jail, participated in murder, manufactured evidence, and lied to investigators. Defendant took a bullhorn so that he could be heard by the McCabes' neighbors, stating: "I just want all Jen McCabe's neighbors to know, in case they don't already know, the people that live right here at 12, they are cop killers. They are cop killers, folks. These are cop killers that live here . . . [The McCabes] are gonna try to live like nothing happened, but we're not going to let them do that because you do not get to kill police officers and fathers and get away with it."
      
 The "Rolling Road Rally" went by Juliana Nagel's home in Canton. Ms. Nagel was at home. She lives in that home with her parents and two siblings. Defendant stopped at Ms. Nagel's home for about ten minutes. At that location, defendant announced that Ms. Nagel lives at the residence, encouraged her to come out and tell the truth, and sought to have Ms. Nagel's neighbors pressure her. Det. Lt. Tully quotes defendant as staying:

You might as well tell the truth, and let the world know what happened. Neighbors, maybe you guys can help us pressure them into this. Julie Nagel was involved, was at the murder of a Boston Police Officer. She knows what happened and she is actively involved in the cover-up. She should not be able to walk around town like none of this happened while an innocent woman named Karen Read suffers the consequences of her silence and her complicity.

While traveling to the next stop, defendant broadcast that the stop at Ms. Nagel's house "was a good one . . . 'cause, like, 'cause they were home."

D. Other Conduct

In and before late September 2023, defendant obtained information about motor vehicle registrations from the Criminal Justice Information Service ("CJIS") database from Jannell Webb

-11-

("Webb"), a civilian dispatcher with the Avon Police Department. Defendant knew or should have known that it was illegal to obtain, or to have Ms. Webb obtain, such information. On September 25, 2023, defendant tweeted a photograph and message depicting vehicles parked at the Proctors' home, including information about the vehicle registrations that he improperly obtained from Webb.
      
On September 24, 2023, defendant broadcast a live YouTube video. When talking about an interaction he had with Colin Albert's aunt, defendant stated: "I'm trying to put her like godson/nephew in jail. And, you know, kind of like, destroy their life."
      
On October 2, 2023, defendant posted a video on YouTube. During that video, defendant stated that "You [Chris Albert] don't have the right [to] live peacefully dude. It's not a thing."

E. Procedural History

On October 11, 2023, defendant was charged with and arraigned on nine criminal complaints, each charging one or more of the crimes of witness intimidation in violation of G.L. c. 268, § 13B, unlawful picketing in order to influence a witness in violation of G.L. c. 268, § 13A, and conspiracy to commit witness intimidation in violation of G.L. c. 274, § 7. The different criminal complaints involve different alleged victims.
      
Also on October 11, 2023, Judge Daniel O'Malley released defendant on personal recognizance and entered an order in all nine dockets requiring defendant to stay away from and have no contact with the named witnesses or alleged victims. In his "Order of Pretrial Conditions
of Release," Judge O'Malley placed an "x" in the box next to "HAVE NO CONTACT, direct or indirect, with:" circled "direct or indirect," and wrote in "stay away + no contact from each named witnesses via any mechanism." He also placed an "x" in the box next to "STAY (distance): AWAY FROM:" and wrote in "Juliana Albert [sic], Michael Proctor,

-12-

Jennifer McCabe, Matthew McCabe, Christopher Albert, Colin Albert, Elizabeth Proctor." Judge O'Malley did not specify a particular distance defendant had to maintain from the particular witnesses in order to satisfy the "stay away" obligation.
      
Defendant now appeals the stay away/no contact order. In his Petition for Review of District Court Bail Determination, defendant argues that all of his actions and statements were done as acts of"indisputable journalism" and that the District Court's order will have "a pronounced chilling effect on his ability to continue to cover the story" of the Read case, and will constitute "a prior restraint on his speech." He also argues that the stay away/no contact order is vague and "essentially  give[s] these eight individuals veto power over [his] reporting by allowing them to simply show up at any venue, any public place, any Courthouse relevant to [his] reporting, and flush him out, evicting him at will under risk of ninety days' incarceration." In subsequent filings, defendant argues that the statutes in question are vague as they apply to him.

DISCUSSION

I. Authority to Review Stay Away/No Contact Order

The District Court had statutory authority to issue the stay away/no contact order. Under Massachusetts law, in considering bail, if a judge of the District Court "determines it to be necessary," the judge may order the defendant "to abide by specified restrictions on personal associations or conduct including, but not limited to, avoiding all contact with an alleged victim of the crime and any potential witness or witnesses who may testify concerning the offense, as a condition of release." G.L. c. 276, § 58, para. 1, last sent. See Brangan v. Commonwealth, 477 Mass. 691, 706 n.18 (2017). In contrast to conditions imposed under G.L. c. 276, § 87, which

-13-

require the defendant's consent, G.L. c. 276, § 58 expressly authorizes a judicial officer setting bail to also include a stay away/no contact order even over a defendant's objection.
      
The parties agree that the Superior Court has the power to review the conditions set by the District Court. See G.L. c. 276, § 58, para. 8 ("The superior court shall in accordance with the standards set forth in the first paragraph of this section, hear the petition for review . . . The justice of the superior court may, after a hearing on the petition for review, . . . make any other order of bail or recognizance or remand the petitioner in accordance with the terms of the process by which he was ordered committed by the district court."). Accord Commonwealth v. Madden, 458 Mass. 607,614 (2010) (Superior Court may review conditions set under G.L. c. 276, § 58A).
      
Rather than challenge the District Court's legal authority to issue the stay away/no contact order, defendant challenges the factual basis for the charges against him, particularly the charges of witness intimidation and unlawful picketing. [10] Det. Lt. Tully's reports, which provide excerpts from recordings later submitted to this court on a thumb drive, demonstrate more than sufficient evidence to support the criminal complaints.
      
Massachusetts law makes it a crime to threaten physical, emotional or economic injury, or to harass a witness or a witness' family in reckless disregard of the fact that it may interfere with a criminal case. Our law also bars retaliation against a witness for participating in a criminal case. The relevant provision states:

Whoever willfully, either directly or indirectly: (I) threatens, attempts or causes physical, emotional or economic injury ... to; . . . or (iii) ... harasses another person who is a ... witness or potential witness [or] police officer, ... [or a] family member of [such] a person ... with the intent to or with reckless disregard for the fact that it may (I) impede, obstruct, delay, prevent or otherwise interfere with a criminal investigation ... [or] a trial or

--------------------------------------------

[10] Defendant does not appear to challenge the factual basis for the charge that he conspired with Webb to procure CJIS information to which he was not legally entitled.

-14-

other criminal proceeding ... ; or (2) punish, harm or otherwise retaliate against any such person ... for such person or such person's family member's participation in any of the proceedings described in this section [commits a crime.]

G.L. c. 268, § 13B(b). For purposes of this statute, the term "harass" is defined as any "act directed at a specific person or group of persons that seriously alarms or annoys such person or group of persons and would cause a reasonable person or group of persons to suffer substantial emotional distress." G.L. c. 268, § 13B(a). For defendant, a violation of§ 13B(b) is punishable by up to 20 years in state prison or 2½ years in the house of correction because "the proceeding in which the misconduct is directed at" (i.e., the Read case) involves "the investigation or prosecution of a crime punishable by life imprisonment."[11] Id.
      
Det. Lt. Tully's reports demonstrate a concerted effort, and repeated pattern of conduct designed, by defendant to cause or threaten economic or emotional injury to witnesses, or family members of witnesses, and to harass those witnesses, to get them to change their testimony. Defendant's actions in soliciting his followers to contact Elizabeth Proctor's employer, to order food from Chris Albert's restaurant and not pick it up or pay for it, and to contact the college Colin Albert attended or planned to attend, were all designed to - and did - inflict economic or emotional injury. Defendant's efforts to persuade neighbors of the McCabes and Juliana Nagel to pressure the witnesses to change their testimony were certainly designed to harass those witnesses as the term "harass" is defined in G.L. c. c. 268, § 13B(a). The numerous calls, contacts, voicemails and the like reflect a systematic pattern of harassment designed to intimidate
the witnesses in the Read case.

--------------------------------------------

[11] If the underlying criminal proceeding did not involve a life felony, defendant would be facing a maximum penalty of up to 10 years in state prison. G.L. c. 268, § 13B(b).

-15-

Citing O'Brien v. Borowski, 461 Mass. 415 (2012), defendant argues that the witness intimidation statute should not apply because he engaged in protected speech under the First Amendment. O'Brien does not go nearly so far; the First Amendment does not authorize journalists to commit crimes. In O'Brien, the court considered a petition for relief from a stay away order under the civil anti-harassment statute, G.L. c. 258E. The court held that the definition of harassment in that statute excludes constitutionally protected speech and that the phrase "intent to cause fear" in the definition of "harassment" is limited to "fear of physical harm or physical damage to property." Id. at 427. Assuming, without deciding, that the same limits apply to the witness intimidation statute, O'Brien still does not aid the defendant's argument. The charges against defendant do not stem from his speech alone, but also his conduct, which is not protected by the First Amendment. Moreover, speech such as 'Tm gonna find you... You wanna fucking dance?" and "we'\! fuck any of you dogs up" -  and defendant's speech designed  to exhort his followers to engage in threatening or harassing conduct - are true threats that are not protected by the First Amendment.[12] See Id. at 423-424, citing Commonwealth v. Chou, 433 Mass. 229,236 (2001)(true threats are "words that are intended to place the target of the threat in fear, whether that threat is veiled or explicit"). Defendant supplies no authority for his argument that the witness intimidation statute does not apply to journalists.

--------------------------------------------

[12] Nor can this type of speech and conduct fairly be considered journalism. In many of these examples, defendant was not reporting anything except for his own actions. Take, for example, the action of publicizing a witness' cellphone number and then broadcasting the sarcastic, berating messages that defendant left on the witness' voicemail. Such a broadcast accomplishes only two things: it induces defendant's followers to call the cellular number to harass the witness, as some of the witnesses experienced; and it entertains defendant's audience with defendant's audacity and confrontational style. Defendant created theater - and an abusive theater at that - at the expense of the witnesses and lead investigator in the Read case, and others related to them.

-16-

Defendant is also charged under G.L. c. 268, § 13A for having picketed or paraded near witnesses' homes with the intent of influencing the witnesses. Section 13A states: "Whoever, ... with the intent of influencing any ... witness ... in the discharge of his duty, pickets or parades . . . in or near a ... residence occupied or used by such ... witness" commits a crime punishable by imprisonment for up to a year.
      
According to Det. Lt. Tully's report, defendant organized and orchestrated a "Rolling Road Rally" to go to the residences of the witnesses. During the rally, which involved a caravan of vehicles - and by defendant's estimate at least 100 people - defendant used a bullhorn to accuse Trp. Proctor of framing Read and announce personal information about Tpr. Proctor's family; to inform the McCabes' neighbors that they were "copkillers" and to recruit them not to let the McCabes "live like nothing happened"; and to pressure Juliana Nagel's neighbors' to get her to "tell the truth" about the "cover-up." Such actions demonstrate an intent to influence and pressure the witnesses to alter their testimony about the Read case.

      Given the existence of probable cause to believe that defendant committed at least some of the offenses with which he is charged, the District Court had the authority to impose a stay away/no contact order under G.L. c. 276, § 58, para. 1, last sent.

II. Constitutional Guarantees of Free Speech and Free Press

Lawful news gathering and news reporting is protected under the First Amendment of the United States Constitution. It is also protected by art. 16 of the Massachusetts Declaration of Rights. See Mass. Const., Part I, art. 16 ("The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth. The right of free speech shall not be abridged."). The constitutional guarantees of free speech and free press, however, do not protect "advocacy" that is "directed to inciting or producing imminent lawless

-17-

action and is likely to incite or produce such action.•· Brandenburg v. Ohio, 395 U.S. 444,447 (1969). Journalists' actions are also circumscribed by the criminal law, at least to the extent the applicable criminal statutes, like those at issue in this case, are not solely directed at the free flow of information. See, e.g., Reporters Committee for Freedom of Press v. American Tel. & Tel. Co., 593 F.2d 1030, 1051 (D.C. Cir. 1978) ("the freedom to gather information guaranteed by the first Amendment is the freedom to gather information subject to the general and incidental burdens that arise from good faith enforcement of otherwise valid criminal and civil laws that are not themselves solely directed at curtailing the free flow of information") (emphasis in original), cert. denied, 440 U.S. 949 (1979).

In addition, courts have an obligation to protect the integrity of the judicial process and may "take such steps by rule and regulation that will protect [its] processes from prejudicial outside interferences." Sheppard v. Maxwell, 384 U.S. 333, 363 (1966). See Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32 n.18 (1984) ("Although litigants do not surrender their First Amendment rights at the courthouse door, ... those rights may be subordinated to other interests that arise in this setting. For instance, on several occasions, this Court has approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant. In the conduct of a case, a court often finds it necessary to restrict the free
expression of participants, including counsel, witnesses, and jurors.") (internal quotations and citations omitted).
      
Notwithstanding defendant's unusual tactics and inflammatory rhetoric, I assume for purposes of this decision that defendant is a member of the press, who, among other things, is covering a pending murder case. He claims that because he is a member of the press, it is a violation of his First Amendment rights and art. 16 of the Massachusetts Declaration of Rights to

-18-

require him to stay away and have no contact with witnesses. Journalism generally involves eliciting information from sources who may be witnesses in a case, not attempting to have witnesses change their testimony or inciting others to pressure witnesses to change their testimony. Defendant has no license, in the name of journalism, to intimidate or harass witnesses and jeopardize the integrity of judicial proceedings. For another citizen, such actions would not be tolerated.
      
Notwithstanding the fundamental importance of news gathering and reporting, the First Amendment does not supersede the proper administration of justice and the court's obligation to ensure a fair trial, including protecting witnesses from intimidation. See Commonwealth v. McCreary. 45 Mass. App. Ct. 797, 799 (1998) (purpose of witness intimidation statute "is to protect witnesses from being bullied or harried so that they do not become reluctant to testify or to give truthful evidence in investigatory or judicial proceedings... [and] to prevent interference with the administration of justice"). The right to a fair trial is just as important to the functioning of democracy as the First Amendment.

III. Due Process Right to Fair Notice of Crime

Defendant argues that the witness intimidation and anti-picketing statutes are vague when they are applied to him as a journalist. "A basic tenet of due process requires that a criminal statute be sufficiently clear to give notice of the prohibited conduct." Commonwealth v. Reyes, 464 Mass. 245,248 (2013). See Bouie v. City of Columbia, 378 U.S. 347,350 (1964). "A statute violates due process and is void for vagueness when individuals of normal intelligence must guess at the statute's meaning and may differ as to its application, thus denying them fair notice of the proscribed conduct." Commonwealth v. Disler, 451 Mass. 216, 223 (2008). See United States v. Harriss, 347 U.S. 612,617 (1954) ("The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be 

-19-

proscribed."); Commonwealth v. McGhee, 472 Mass. 405,414 (2015) ("Penal statutes must define the criminal offense with sufficient definitiveness that ordinary people can understand what conduct is prohibited.") (internal quotations and citations omitted).

Defendant asserts that the stay away/no contact orders should be stricken because G.L. c. 268, § 13A, and G.L. c. 268, § 13B, did not put him on fair notice that his conduct, which he describes as normal journalistic tactics, was criminal. I am not persuaded by this argument. The words of the statute are commonly accepted and understood, and the term "harass" is sufficiently defined under G.L. c. 268, § 13B, to put an individual on notice of the proscribed conduct. See McGhee, 472 Mass. at 414 (the language in a statute "will be constitutionally adequate if it 'conveys [a] sufficiently definite warning as to the proscribed conduct when measured by common understanding and practice."') (citation omitted). The dearth of cases charging journalists with such crimes does not compel a conclusion that the statute is vague, particularly where defendant's tactics, as previously described, cannot properly be classified as typical behavior for a journalist.

IV. Conditions of Release

There is evidence here that defendant's statements and actions may intimidate witnesses involving in the Read case and threaten the integrity of the proceedings in that case. The language in the first paragraph of G.L. c. 276, § 58, permitting a judge to institute a stay away/no contact order as a condition of release "clearly contemplates that limits may be placed on a defendant's contact with an alleged victim, as well as with other witnesses, presumably for the purpose of 'preserving the integrity of the judicial process."' Commonwealth v. Norman, 484

-20-

Mass. 330, 337 (2020) (citation omitted). The general stay away/no contact orders here are justified to protect the witnesses and the judicial process.
      
In certain respects, however, the District Court's order is ambiguous. First, by not including a distance in connection with the stay away order, the District Court did not provide defendant with sufficient information so that he could conform his conduct to the court's order. I will amend the conditions to require defendant to stay at least I 00 feet away from any of the witnesses.

Second, the District Court's Order of Pretrial Conditions of Release does not reflect consideration of defendant's interest in reporting on the Read case, and whether there are other less restrictive alternatives to allow defendant access to court proceedings attended by the alleged victims or witnesses in the Stoughton District Court matters. Here, defendant has a journalistic interest in reporting on the Read case, which should be able to be accommodated by the court officers in the controlled environment of the courthouse. In the mine run of domestic violence cases in which one party to the case is ordered to stay a specified distance away from the other party (often 50 yards or 100 yards), both parties are permitted to attend their common court proceedings even though it will bring them into closer proximity than is specified in the stay away order. This case is no different. Provided defendant complies with the rules of the court, defendant will be permitted to attend proceedings in the Read case, even if victims or witnesses in the Stoughton matters are in attendance.

ORDER

Defendant's petition for review of the Stoughton District Court's stay away/no contact order is DENIED as to the no contact order, and is DENIED as to the stay away order except that the stay away order is amended to require defendant to stay at least 100 feet away from the

-21-

named witnesses and to allow defendant to attend proceedings in the Read case, even if that will bring him within 100 feet of any named witnesses.

/s/Peter B. Krupp
Justice of the Superior Court

November 9, 2023